781 A.2d 110

**COMMONWEALTH OF PENNSYLVANIA, Appellee**

v.

**Leroy STALLWORTH, Appellant**

Supreme Court of Pennsylvania.

Argued Dec. 4, 2000.

Decided Oct. 4, 2001.

James J. Karl, for Leroy Stallworth.

Robert A. Graci, Harrisburg, Joseph C. Madenspacher, Lancaster, for Commonwealth of PA.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

ZAPPALA, Justice:

This is a direct appeal pursuant to 42 Pa.C.S. §§ 722(4) and 9711(h). Appellant, Leroy Stallworth, was convicted by a jury of murder in the first degree and burglary. At the conclusion of the penalty phase of Appellant's trial, the jury found the existence of two aggravating circumstances: that the defendant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and that at the time of the killing, the defendant was subject to a court order restricting in any way his behavior towards the victim pursuant to 23 Pa.C.S. Ch. 61 (relating to protection from abuse), 42 Pa.C.S. § 9711(d)(18). The jury also found two mitigating circumstances. The jury then returned a sentence of death.

The evidence of record, viewed in the light most favorable to the Commonwealth as verdict winner, discloses the following. Appellant and his estranged wife, the victim Natasha Stallworth, were separated and living apart, each with new partners. They had a six year old daughter, who resided with the victim. Appellant frequently watched and cared for the child. Appellant and the victim often argued over matters concerning their child and eventually, the victim sought financial support from Appellant for her care. Appellant threatened the victim on several occasions, saying that he would kill her if she ever restricted his right to see their daughter.

On January 2, 1998, the day before the murder, Appellant and the victim argued over their daughter and the police were called to intercede. As a consequence of this dispute, the victim obtained a protection from abuse (PFA) order restricting Appellant's behavior toward her and also restricting Appellant's access to his daughter. Appellant was not served with notice of the PFA order prior to the victim's murder.

On January 3, 1998, Appellant was supposed to pick up his daughter at the victim's residence. He called the victim and an argument ensued. Following their conversation, the victim called 911 to report that Appellant had threatened her life. Approximately twenty minutes after phoning the victim, Appellant arrived at her home, kicked in the door and shot her twelve times about the head and body with his 9mm handgun. Police arrived to find Appellant barricaded inside the victim's home. After some negotiation, Appellant surrendered and was taken into custody.

On appeal, Appellant alleges numerous errors regarding rulings made by the trial court prior to trial, during trial and at the penalty hearing. Before addressing these specific issues, we note that although Appellant does not raise a sufficiency argument, pursuant to *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), we are required to determine whether there was sufficient evidence to sustain Appellant's conviction.

Witnesses saw Appellant kick down the door to the victim's home and enter the premises. Witnesses heard the victim yelling and pleading for her life. The victim was shot twelve times with Appellant's gun; multiple shots were fired at vital parts of the victim's body. The victim's blood was found on Appellant's clothing. Finally, Appellant surrendered to the police, exiting the victim's home where her body was later recovered. Thus, the evidence of record was more than sufficient to sustain Appellant's convictions for first degree murder and burglary. We now turn to the specific allegations of error raised by Appellant.

The first two issues argued by Appellant relate to the suppression court's rulings. Specifically, Appellant asserts that the suppression court erred in denying his motion to suppress statements he made to police officers prior to his formal arrest. Appellant also asserts that the suppression court erred in denying his motion to suppress the clothing police seized from him and, in turn, the blood evidence derived therefrom, alleging that police improperly seized these items without a warrant.

This Court's scope of review of a suppression court's ruling is limited to determining whether the findings of fact are supported by the record and whether the legal conclusions drawn from those facts are in error. *Commonwealth v. Crompton*, 545 Pa. 586, 682 A.2d 286 (1996); *Commonwealth v. Chambers*, 528 Pa. 403, 598 A.2d 539 (1991). When a defendant has appealed an order denying a motion to suppress evidence, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111 (1985), *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). If they are supported in the record, we are bound by the facts as the suppression court found them and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error. *Id.*

Immediately after shooting the victim, Appellant called a 911 operator and reported that he had just shot his wife and that he was still at her residence. The operator maintained contact with Appellant and learned that Appellant was considering taking his own life.

Once the scene was secured by police officers, two police negotiators contacted Appellant via telephone at the victim's residence and remained in constant contact with him for the next two hours. They spoke with Appellant and attempted to find out what Appellant's plans were, and, ultimately, to negotiate a peaceful end to the situation. Eventual-

ly the officers were able to convince Appellant not to take his life and to peaceably surrender.

During the conversation between Appellant and the officers, Appellant made incriminating statements regarding his involvement in the shooting. He maintains that the statements he made to the negotiators should have been suppressed since, he alleges, the conversation with the officers constituted custodial interrogation for which he was entitled to, but did not receive, *Miranda* [1] warnings.

In *Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181 (1996), this Court dealt with a similar claim in a factually identical case. There, appellant Jones had barricaded himself in his home after shooting several individuals. Police surrounded the home and a hostage negotiator attempted to persuade him to surrender peaceably. During the course of negotiations, Jones made inculpatory statements to the police and later sought to suppress those statements. Specifically, Jones claimed that he was subject to custodial interrogation and, therefore, should have been Mirandized, since the police knew he was a suspect in the shootings and that their communications with him were likely to illicit incriminating statements.

This Court rejected Jones's claim, finding it "wholly without merit." *Id.* at 1188. We noted the following:

> First, contrary to his assertions, he was not in custody at this time and, therefore, was not entitled to *Miranda* warnings. Even assuming he was entitled to such warnings, the statements made by Appellant during this stand-off were not the product of police interrogation, but rather were unsolicited statements uttered in response to police negotiations designed to encourage Appellant to surrender peacefully and as such, were admissible.

*Id.* (citations omitted).

As in *Jones*, the Appellant here was not in police custody at the time he made the statements at issue. To the contrary, he

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

was barricaded in the victim's home. Additionally, the statements Appellant made to police were not the result of interrogation.

Appellant points to several questions asked by the negotiators during the more than two hours of negotiation and argues that these questions were improper as they were designed to elicit inculpatory information from him. For example, Appellant claims that the negotiators improperly asked him questions regarding his frame of mind, his situation with the victim, and what led to the shooting.

We do not find merit to Appellant's claim. Although Appellant points to a few isolated questions which he deems to be improper interrogation, a review of the transcript of the negotiation in its entirety reveals that the negotiators engaged Appellant in conversation in an attempt to discover what Appellant's plans were given the situation, gain Appellant's trust, and peacefully end the standoff.

Based on the foregoing, we conclude that the trial court properly denied Appellant's motion to suppress the statements he made to police during the negotiation.

██ Appellant next asserts that the trial court erred in failing to suppress as evidence the clothing he was wearing at the time of the shooting.

After Appellant surrendered, he was taken to police headquarters for booking. The detectives indicated to Appellant that they wished to speak to him regarding the death of the victim. He was then read his *Miranda* warnings. Appellant initially signed a waiver indicating he was willing to speak with the officers, but he subsequently changed his mind. Appellant was then provided with an opportunity to contact an attorney. While waiting for counsel to arrive, Detective Hugh Urey noticed what appeared to be bloodstains all over Appellant's clothing. Detective Urey then confiscated Appellant's clothing as evidence. Subsequent testing conducted on the clothes revealed that the blood found on the clothing was that of the victim.

Appellant asserts that the foregoing evidence should have been suppressed since Detective Urey seized Appellant's clothing without first obtaining a warrant. Appellant maintains that there is no authority authorizing the warrantless seizure of these items.

■ We find no merit to Appellant's claim. The seizure of Appellant's clothing was proper as incident to his lawful arrest. It is not a violation of the constitutional guarantee against unreasonable search and seizure for officers, when making a lawful arrest with or without a search warrant, to discover and seize any evidence, articles or fruits of crime found upon the prisoner or upon the premises under his control at the time of his lawful arrest, if it is directly connected with the offense charged. This constitutes merely an incidental seizure of evidence of crime in the execution of a lawful arrest and not a wrongful invasion by an unwarranted seizure of property. *Commonwealth v. Aljoe*, 420 Pa. 198, 216 A.2d 50 (1966).

In *Aljoe*, police seized the defendant's clothing following his arrest for a brutal murder; later testing revealed the presence of tissue from the victim on the clothing. Likewise, in *Commonwealth v. Bundy*, 458 Pa. 240, 328 A.2d 517 (1974), police seized the defendant's trench coat following his arrest and discovered fibers from the victim's bedding on the article. In both cases, we rejected the argument that the items were improperly seized and held that seizure of the articles was proper as incident to the lawful arrest of the defendants.

Here, Appellant was lawfully arrested after he exited the residence of the victim, who had just been shot. He was taken into police custody and Detective Urey observed, in plain view, bloodstains on his pants. The officer then seized Appellant's clothing, which, later tested positive for the victim's blood. As we noted in *Bundy*, regarding the seizure of the defendant's coat after he was taken into police custody:

The taking of the trench coat, which he was wearing at the time of his arrest, constituted a search incident to a lawful arrest. See *Chimel v. California*, 395 U.S. 752, 89 S.Ct.

2034, 23 L.Ed.2d 685 (1969); *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); *Commonwealth v. Sharpe,* [449 Pa. 35, 296 A.2d 519 (1972) ]; *Commonwealth v. Brayboy,* 431 Pa. 365, 246 A.2d 675 (1968). The mere fact that the seizure of the coat was not contemporaneous with the seizure of the person of the appellant, but rather occurred after he had been removed to the place of detention, does not prevent the seizure from being considered incident to the arrest. *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *United States v. England,* 474 F.2d 1343 (4th Cir. 1973); *Wright v. Edwards,* 470 F.2d 980 (5th Cir.1972).

328 A.2d at 520.

■ Appellant's next argument is that the trial court erred in denying his motion in limine seeking to bar evidence of the victim's filing of a petition for relief under the Protection From Abuse Act, 23 Pa.C.S. §§ 6101–6117, the statements made in such petition, and her procurement of the temporary order. In the motion in limine, Appellant objected to the evidence on the basis of relevancy and hearsay. Appellant renewed these objections at trial regarding the admissibility of this evidence.

The victim obtained a PFA order on January 2, 1998, one day before she was killed. Appellant was not served notice of the order prior to killing the victim. In the PFA application, the victim made three specific allegations involving threats against her made by Appellant. Specifically, she alleged that on the day she sought the PFA, January 2, 1998, Appellant had threatened to take her child. She also alleged that on December 11, 1997, Appellant told her that she better watch herself after the holidays due to the fact that she was seeking child support. Finally, the victim alleged that Appellant had made repeated threats about shooting and killing her since their separation.

At trial, the Commonwealth argued that the PFA evidence was being offered for two reasons: first, as probative evidence that the victim would not have permitted Appellant to enter

her home, which supported the burglary charge; second, as proof of Appellant's intent and motive. The Commonwealth represented that the evidence was not being offered as proof of the matters asserted therein.

Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. *Commonwealth v. Bardo*, 551 Pa. 140, 709 A.2d 871 (1998). Admissibility depends on relevance and probative value. *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395 (1994). Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. *Id.*

We agree with the Commonwealth's assertion that the evidence was relevant to establishing the burglary charge against Appellant, as well as showing Appellant's intent and motive.

As to the burglary prosecution, a person is guilty of burglary if he enters a building or occupied structure with the intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter. 18 Pa.C.S. § 3502. Evidence that the victim had obtained a court order specifically excluding Appellant from her residence was probative of the Commonwealth's allegation that Appellant entered the residence while not licensed or privileged to do so.

Although Appellant correctly points out that other evidence presented by the Commonwealth tended to establish this element of the burglary, namely, eyewitnesses testified that Appellant kicked in the victim's door prior to entering her home, the PFA evidence was indicative of the victim's state of mind in this regard and was clearly relevant. Additionally, because this evidence was used, not to demonstrate the truth of the matters asserted in the PFA petition, but to demonstrate the victim's state of mind regarding Appellant, the trial

court did not abuse its discretion in admitting the evidence over counsel's hearsay objection.

Regarding the use of the evidence as indicative of Appellant's intent and motive for the crime, we agree that such evidence was relevant. Again, the admission into evidence of prior bad acts is within the sound discretion of the trial court, and we will reverse only upon a showing of an abuse of that discretion. *Commonwealth v. Miles*, 545 Pa. 500, 681 A.2d 1295, 1304 (1996). Generally, evidence of prior bad acts or unrelated criminal behavior is inadmissible. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155, 159 (1978). Evidence of prior bad acts, however, is admissible where it tends to establish malice, motive, or intent for the offense charged. *Commonwealth v. Jones*, 499 Pa. 522, 454 A.2d 8, 10 (1982). Evidence concerning the relationship between the defendant and the victim may be relevant and admissible to prove ill will, malice, or motive. *Commonwealth v. Myers*, 530 Pa. 396, 609 A.2d 162, 164 (1992).

Clearly, the fact that the victim sought a PFA order and the allegations made by her therein were relevant regarding the relationship, as perceived by the victim, between Appellant and her. As to Appellant's hearsay objection in this regard, we note that an out-of court statement by a murder victim may be admitted to establish the motive of the defendant when those statements are not offered to prove the truth of the matter asserted. *Commonwealth v. Griffin*, 511 Pa. 553, 515 A.2d 865 (1986). Here, the PFA application and the statements made by the victim therein were used by the Commonwealth to show the victim's state of mind regarding the relationship between Appellant and her and the malice and/or ill-will she perceived. We do not find an abuse of discretion on the part of the trial court in admitting this evidence.

Next, Appellant argues that the trial court erred in permitting the testimony of eight witnesses who testified regarding threats that Appellant made to the victim in their

presence.[2]  Appellant maintains that the evidence was not relevant and was highly prejudicial.

The same general principles of relevancy apply here as with respect to the preceding issue.  Relevant evidence is evidence that logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact.  *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344 (1998).

At issue here is the testimony of eight witnesses who testified regarding the marital relationship between Appellant and the victim.  The Commonwealth asserts that this evidence was relevant as it was presented in an effort to prove Appellant's ill will, motive and malice toward the victim, as well as to show the nature of the relationship between the parties.  We do not believe the trial court abused its discretion in permitting this evidence.

Two Commonwealth witnesses, Debra Milburn and Theodor Turner, testified to conversations they overheard wherein Appellant threatened to shoot the victim if she ever sought support payments from him.  In December of 1997, the victim did seek support payments from Appellant and, three weeks later, she was killed by Appellant.  Thus, the testimony of these witnesses was relevant to show Appellant's possible motive for the murder.

**2.** Appellant claims, in the alternative, that the Commonwealth failed to give proper pretrial notice of its intention to introduce "prior bad act" evidence as required by Pa.R.E. 404(b).  Although it does not appear that the Commonwealth gave specific notice of its intent in this regard, the record reveals that counsel for Appellant indicated to the court that he had received all of the police reports in discovery;  these reports contained the evidence introduced by the Commonwealth regarding prior threats made by Appellant.  Additionally, the Commonwealth provided an offer of proof as to each witness's testimony and Appellant was able to articulate an objection regarding each witness.  On at least one occasion, upon counsel's objection, Appellant was offered additional time to deal with the evidence if needed.  In addition to the foregoing, Appellant does not now claim that he was prejudiced by the Commonwealth's failure to give specific notice of this evidence, rather, he merely notes that the Commonwealth did not strictly comply with the rule.  We find that Appellant is not entitled to relief on this basis.

The remaining six witnesses testified that they had heard Appellant tell the victim that he would "put her six feet under" if she ever attempted to restrict his ability to see his daughter. The evidence of record indicates that the victim did in fact restrict the Appellant's right to see his daughter, through the PFA order, and that Appellant learned of this restriction.[3] Appellant killed the victim after learning of this information. Thus, the witnesses' testimony regarding the threats they heard Appellant make in this regard were relevant to establishing Appellant's motive for the murder.

Next, Appellant argues that the trial court erroneously admitted into evidence the call the victim made to a 911 operator on the day she was murdered. During the conversation, the victim told the operator that Appellant had just called her on the telephone and threatened her life. Appellant claims that this evidence was hearsay and does not fall within any of the exceptions to the hearsay rule. The Commonwealth asserts that the evidence was properly admitted pursuant to the excited utterance exception to the hearsay rule. See Pa.R.E. 803(2).

For a statement to be an excited utterance, it must be:

[A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.... Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event.

3. The extent of Appellant's knowledge in this regard is more fully discussed in the final issue of the opinion.

*Commonwealth v. Stokes,* 532 Pa. 242, 615 A.2d 704, 712 (1992), *quoting Commonwealth v. Green,* 487 Pa. 322, 409 A.2d 371, 373–74 (1979).

The Commonwealth asserts that all of the requisite factors for an excited utterance were met here. It points out that the victim called a 911 operator immediately after the Appellant phoned her and reported the startling event that she had just experienced, i.e., Appellant's threatening her life. While Appellant concedes the potential applicability of the excited utterance exception regarding the victim's statement to the 911 operator, Appellant maintains that independent proof of the startling event, i.e., Appellant's threat, was necessary. Appellant argues that the victim's statement itself cannot be the sole basis for finding that Appellant actually threatened her. Appellant notes decisions from several other jurisdictions that require independent proof of a startling event in order for a statement to be admissible as an excited utterance.[4]

Appellant correctly points out that there was no independent corroborative evidence that Appellant threatened the victim as stated by her to the 911 operator. The evidence of record does show, however, that Appellant called the victim 20 minutes prior to her murder, and that during the conversation, Appellant and the victim argued over the fact that the victim had obtained some type of court document restricting Appellant's access to his daughter. Other evidence of record shows that Appellant had threatened to kill the victim on prior occasions if she ever attempted to restrict his access to his daughter. The victim called a 911 operator immediately following her conversation with Appellant and reported the alleged threat. The evidence also shows that 20 minutes after their conversation, Appellant shot the victim.

Given the foregoing, we decline to determine whether or not the victim's statement was properly admitted as an

---

4. Appellant cites *People v. Burton,* 433 Mich. 268, 445 N.W.2d 133 (1989); *Hartford Accident & Indemnity Co. v. Hale,* 400 S.W.2d 310 (Texas 1966); *Truck Insurance Exchange v. Michling,* 364 S.W.2d 172 (Texas 1963).

368

excited utterance since we hold that even if the court erred in admitting the statement, any such error was harmless. "Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 350 (1999).

The statement regarding Appellant's threat made during the 911 call was merely cumulative of other properly admitted evidence. Moreover, given the other overwhelming evidence of Appellant's guilt in the record, we do not find that Appellant was prejudiced by the court's admission of this evidence.

■ Next, Appellant argues that the trial court erred in overruling his objections to the testimony of Dr. Wayne K. Ross on several grounds. Dr. Ross, a forensic pathologist, testified on behalf of the Commonwealth regarding bloodstains found at the crime scene. He was qualified as an expert in the field of pathology and bloodstain analysis. Appellant complains that Dr. Ross' testimony went beyond the scope of his qualifications as an expert in that he gave testimony regarding "crime scene reconstruction," which was not a stated basis for his testimony. Appellant also complains that Dr. Ross' testimony was improper as it was speculative in nature and because he testified regarding matters of common knowledge not appropriate for expert testimony.[5]

5. In his brief, Appellant notes several other bases for which he objected to Dr. Ross' testimony before the trial court, namely, that his testimony should be stricken completely since the Commonwealth failed to give Appellant the opportunity to view the crime scene and that he was not sufficiently qualified as a bloodstain expert. While Appellant mentions these arguments that he made before the trial court in his brief, he does not argue these issues in his brief to this Court.

■■■■■  We begin our review by noting that in this jurisdiction, "the standard for qualification of an expert witness is a liberal one." *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664 A.2d 525, 528 (1995). In determining whether a witness is qualified to testify as an expert, the trial court judge must determine whether the witness "has any reasonable pretension to specialized knowledge on the subject under investigation." *Id.* We shall not reverse a trial court's determination that a witness is qualified to testify as an expert unless we find that the trial court abused its discretion. *Id.*

We do not find that the trial court judge abused his discretion here. Contrary to Appellant's contention, the record reflects the Commonwealth's intent to qualify Dr. Ross in the area of crime scene reconstruction. In response to Appellant's objection to Dr. Ross' testimony at trial, the Commonwealth made the following representation:

> Dr. Klinger provided the testimony about the wounds, but she never saw the crime scene, she never saw the photos from the crime scene, and she gave no crime scene analysis. *And that's what Dr. Ross is here to do . . . .*

N.T. January 21, 1999 at 977 (emphasis added).

Furthermore, the Commonwealth indicated that Dr. Ross' testimony "would be in the form of bloodstain analysis, *crime scene analysis,* of putting all these pieces together between the crime scene, the bloodstain and the wounds . . . ." *Id.* at 978 (emphasis added). During voir dire, Dr. Ross explained that part of his duties as the forensic pathologist for Lancaster County involves "work[ing] with various police departments and the D.A.'s office, as well as anyone else who might be available, in reconstructing crime scenes, examining traffic accidents, things of that sort." *Id.* at 992.[6]

6. Appellant, in the alternative, argues that "crime scene reconstruction" is not a recognized area of expertise and that is was, therefore, improper for Dr. Ross to testify as an expert in the field. This argument lacks merit as the subject area of expert testimony need not be a recognized specialty or one subject to board certification. *See Commonwealth v. Henry,* 524 Pa. 135, 569 A.2d 929 (1990).

370

■■■ As noted, Appellant also contends that Dr. Ross' testimony was speculative and was not special in nature, but was, instead, within the common knowledge of a lay person. Specifically, Appellant complains:

The testimony is replete with instances in which the witness suggests a litany of possible causes for the observed facts, leading him to testify that the facts were "consistent" with a particular scenario that would be most prejudicial to Defendant. The witness's own phraseology, all from the *direct examination,* exposes the speculative nature of this testimony: "I mean, could it be somethin' else? Sure." (N.T. Trial, p. 1024); "Take your pick, any of those." (N.T. Trial, p. 1036); "She's down on her knees or something or crouching *or whatever.*" (N.T. Trial, p. 1073) (emphasis added).

Also, the witness himself suggests that he is usurping the jury's function by identifying much of his work as the application of "common sense." (N.T. Trial, pp. 1013, 1071).

Appellant's Brief at 56.

■■■ We find no merit to Appellant's assertions concerning Dr. Ross' testimony. Appellant has focused on isolated instances where Dr. Ross conceded that although he was rendering an opinion within a reasonable degree of scientific certainty regarding the evidence, there might be alternative explanations. For instance, in the example cited by Appellant, Dr. Ross testified that to a reasonable degree of scientific certainty, blood drops found on the victim's shoe came from a contact transfer. N.T. January 21, 1999 at 1023–1024. Dr. Ross also indicated that the blood could have gotten on the shoe in another manner, but that he did not observe any evidence of the classic patterns that would so indicate any other explanation. Thus, he concluded to a reasonable degree of scientific certainty, that the blood on the shoe was the result of a contact transfer. This was appropriate. It is not necessary that an expert testify that his conclusions are stated beyond a reasonable doubt. *Commonwealth v. Cotton,* 338 Pa.Super. 20, 487 A.2d 830 (1984). Whether an expert's

testimony is persuasive beyond a reasonable doubt is a matter for the jury's consideration. *Id.* at 833.

The next quote cited by Appellant wherein Dr. Ross stated, "take your pick, any of those," is, again, misconstrued by Appellant. Here, Dr. Ross testified that blood found on the left side of Appellant's shoe was the result of a contact transfer. Dr. Ross noted that the end of the stain had a feathery edge to it which indicated that Appellant's shoe came into contact with the victim's blood and that this contact could have occurred by rubbing against the body, kicking, dragging, or by coming into contact with blood on the floor. Looking at Dr. Ross' testimony in context, it is clear that the pertinent aspect of the testimony was that the stain was caused by a contact transfer, not how the transfer occurred.

The final passage quoted by Appellant refers to Dr. Ross' testimony indicating that, to a reasonable degree of scientific certainty, the evidence disclosed that the shots fired at the victim came from above. In the questioned passage, Dr. Ross merely indicated that because the shots came from above, the victim was necessarily in a lower position, though he could not be sure how she was positioned, i.e., "down on her knees or something or crouching or whatever." Again, viewing Dr. Ross' testimony in context, we find it to be proper.

We likewise reject Appellant's claim that Dr. Ross' testimony was inappropriate as expert testimony because it was within the common knowledge of a layperson. Specifically, Appellant notes that Dr. Ross identified much of his work as the application of common sense. Appellant's Brief at 56. This, however, misconstrues Dr. Ross' statements. Only on two occasions did Dr. Ross use the phrase common sense. First, when asked to provide a general background for the field of bloodstain analysis, Dr. Ross stated, at the outset, that everyone has a common sense understanding of bloodstains. He then went on to explain, generally, about swipe patterns, conical patterns, impact spatter, projected blood patterns, castoff patterns, flow patterns, and forceful impact spatter. Dr. Ross never indicated that the average layperson has a

"common sense" understanding of the flow patterns he went on to describe and explain in detail.

The second reference Dr. Ross made to "common sense" was in reference to pine needles that were discovered throughout the victim's clothing. Dr. Ross was asked if this was significant and he stated, "Sure. From a reasonable certainty, or even from common sense, obviously if she's got pine needles all over her, she's moving about the room." N.T. January 21, 1999 at 1071. Appellant points to this isolated passage as demonstrating that much of Dr. Ross' conclusions were the result of common sense. This argument is entirely without merit as Dr. Ross explained in great detail how each of the flow patterns and stains found at the crime scene depicted certain events that occurred during the murder, none of which was purported by Dr. Ross to be within the common knowledge of the average layperson.

The remainder of Appellant's claims relate to whether it was proper for the jury to consider the aggravating circumstance set forth at 42 Pa.C.S. § 9711(d)(18), which provides:

(18) At the time of the killing the defendant was subject to a court order restricting in any way the defendant's behavior toward the victim pursuant to 23 Pa.C.S. Ch. 61 (relating to protection from abuse) or any other order of a court of common pleas or of the minor judiciary designed in whole or in part to protect the victim from the defendant.

The term "subject to", used in the foregoing provision, is not defined. Appellant asserts that the term "subject to" is ambiguous. He posits that such term is open to several different meanings: either that a person is "subject to" a PFA order once he has been given actual notice of such a PFA order or its equivalent and, thus, can be held in contempt for violating such order, or, it applies to any person named as a respondent in a PFA order protecting the victim, even if such person was ignorant of the existence of the order.

The Commonwealth, on the other hand, asserts that the plain meaning of the term "subject to" used in Section 9711(d)(18) is clear and unambiguous. Specifically, the Com-

monwealth maintains that one is "subject to" a court order the minute a judge signs it, regardless of whether or not notice has been given. The Commonwealth points out that if the legislature intended that a defendant actually be served with notice of the PFA or have knowledge of the order to be "subject to" such order, it could have so stated. Because the legislature did not include notice as part of the aggravating circumstance, the Commonwealth asserts that it is not required.

Appellant concedes that the legislature could have made the first meaning more explicit if it intended that a defendant be given notice or have knowledge of such an order before he or she is "subject to" such order; however, Appellant points out that the legislature could have been more explicit about the second meaning if it so intended, i.e., that the aggravator applies to any person named as a respondent in a PFA.

We agree with Appellant that the term "subject to" as used in Section 9711(d)(18) is not clear and free from ambiguity and is open to the several different meanings noted by Appellant. We begin our discussion by noting that the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. 1 Pa.C.S. § 1921(a). When ascertaining legislative intent, penal statutes are to be strictly construed. 1 Pa.C.S. § 1928(b)(1). Moreover, in the context of a statute defining a category of persons against whom it is permissible to impose a sentence of death, such strict construction should militate in favor of the least inclusive interpretation. See *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (stating that aggravating factors must "genuinely narrow the class of death-eligible persons" in a way that reasonably "justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder").

Given the foregoing, we conclude that the more restrictive interpretation advocated by Appellant, requiring that a defendant either be given actual notice or have the equivalent

knowledge of a PFA order so as to be "subject to" such an order, is the proper interpretation of Section 9711(d)(18).[7]

As an alternative argument, the Commonwealth maintains that even if the Court were to conclude, as we have, that actual notice and/or the practical equivalent thereof is required in order for Section 9711(d)(18) to apply, such requirement was met here. We disagree.

Although there was record evidence demonstrating that Appellant had knowledge that the victim had obtained some type of court order restricting his rights regarding his daughter, there is no record evidence indicating that Appellant had anecdotal knowledge of the existence of an order "restricting in any way his behavior towards the victim." Specifically, the Commonwealth cites to the fact that following the argument that took place between Appellant and the victim on the day before the murder, the police gave both Appellant and the victim information regarding their rights under the PFA Act. The Commonwealth notes that the testimony of Appellant's girlfriend, Evelyn Flores Weidman, indicates that Appellant read the information and discussed it with her. The testimony, however, reveals that Appellant discussed with Weidman only the possible custody ramifications of the victim's actions regarding these papers, not that the victim could obtain a court order restricting his rights regarding *her*. Weidman testified, in relevant part:

Q. ... And then when you came back you said you saw those papers?

A. Uh-huh. He showed me the paper.

Q. He showed them to you?

A. Uh-huh.

Q. Did you—did you talk about it?

A. I talked to him, and he said, This is the paper that the cops had gave me. And he said, This is—

---

**7.** We note that in construing Section 9711(d)(18) narrowly, given our conclusion that this provision is not free and clear from ambiguity, we do not address whether it would be constitutionally permissible for the legislature to clearly negate the need for notice of a PFA order, if it so intended.

And I looked at it. It was a list of different agencies around Lancaster County, of different places that could help, like Children & Youth and stuff like that.

Q. And what else did you talk about?

A. I talked to him. And he's like, I don't—I don't know what she's tryin' to do.

And I said, well, you know, if she does try to go for custody, it's gonna be temporary until you'll be able to go to court and fight for your—on your behalf.

\* \* \*

Q. So you told him, if anything happened, it would be temporary.

A. Yes sir.

\* \* \*

Q. Was there any more discussion about that that night?

A. Basically, that was it. After, he had spoke, saying that he wanted to get a better job and get a place of his own before he would try to go get his—his half of custody of Naya.

(N.T. January 20, 1999, at 815–16).

Next, the Commonwealth refers to a telephone conversation between Appellant and the victim that Weidman testified to overhearing just prior to the victim's murder. During the conversation, Appellant referred to certain "papers" that the victim spoke of. The Commonwealth asserts that one could assume that the "papers" are in reference to the PFA. Again, however, the conversation, at most, indicates Appellant's belief that the victim had obtained some paper regarding his rights as to his daughter, not the victim. Weidman stated:

Q. Did—did you hear every word that he said to her?

A. No, sir.

Q. Okay. What do you remember hearing him say?

A. Well, what I heard, I heard him saying, Where's Naya? He kept asking her, Where's Naya? And then I don't know what she was saying on the phone, but then he turned around and said, Well, what paper are you talkin' about?

Because if you talkin' about the paper that I have, it doesn't say nothin' like that.

*Id.* at 823. The Commonwealth states that "it is reasonable to conclude, and far from mere speculation, that Natasha had just told Defendant that she had obtained a Protection From Abuse (PFA) order against him. The fact that Defendant went over to Natasha's home and killed her within minutes after this phone call is further circumstantial evidence that she had just informed him of the order against him." Commonwealth's Brief at 68. While it is clear that Appellant and the victim discussed court "papers", nothing in the foregoing conversations or testimony reveals that Appellant was put on notice of the contents of the PFA "restricting in any way his behavior towards the victim." To the contrary, the evidence is more indicative of the fact that Appellant believed the victim had obtained a court order restricting in some way his right to see his daughter. Moreover, all of the evidence of motive presented by the Commonwealth indicates that Appellant had threatened the victim in the past that he would harm her if she sought support or restricted his access to his daughter.

Finally, as further evidence that Appellant did not have knowledge of the substance of the PFA order, but merely thought the victim had obtained some type of custody order, we note the following exchange that took place between Appellant and the police negotiator following the murder:

Sgt. Hurdle: But, she never, did she, she never tried to get custody, right?

Appellant: She went down, she went, I don't know what she did yesterday.

Sgt. Hurdle: Yesterday?

Appellant: She did something yesterday down at Domestic Relations, she said she got a Court Order, I wasn't suppose to see her.

Sgt. Hurdle: Oh, you weren't, ok, you weren't supposed to see her?

Appellant: No, my little girl.

Sgt. Hurdle: Oh, you're (sic) little girl.

Appellant: She said I can't see my little girl.

(911 Transcript at 53).

Instantly, because Appellant was never served with notice of the PFA order, which had only been issued fewer than twenty-four hours before the killing, and because he did not have anecdotal knowledge of the existence of an order "restricting in any way his behavior towards the victim," he was not "subject to" such order for purposes of the aggravating circumstance set forth at 9711(d)(18).

Based on the foregoing, we affirm the verdict of guilt, but vacate the sentence of death and remand for a new sentencing hearing.[8]

Mr. Justice SAYLOR files a concurring and dissenting opinion in which Mr. Justice NIGRO joins.

SAYLOR, Justice, concurring and dissenting.

I join in the result reached by the majority in terms of affirming the conviction and remanding for a new sentencing hearing; however, I do not agree that the victim's statements contained in the PFA application were admissible, and I view the evidence that Appellant was aware of the PFA order as sufficient to create a question of fact to be resolved by the jury at the sentencing hearing.

## I.  PFA Statements

The statements made by the victim in the PFA application, to the effect that Appellant had threatened to shoot and kill or otherwise harm her, would appear to be hearsay and therefore inadmissible unless they fall within an exception to the hearsay rule.[1]  The majority concludes, however, that the state-

---

8. Given our conclusion, we need not address Appellant's alternative argument that Section 9711(d)(18) is unconstitutionally void for vagueness.

1. To be precise, these statements would constitute double hearsay: Appellant allegedly made verbal threats to the victim, and the victim repeated the threats to the PFA court.  *See generally Commonwealth v. Laich*, 566 Pa. 19, 777 A.2d 1057 (2001).  Appellant's statements to the victim are admissible as party admissions.  *See id.* at 24, 777 A.2d at

ments are not hearsay because they were presented solely to show the victim's state of mind, and not to prove the truth of the matter asserted (that Appellant threatened the victim with bodily harm on several occasions).

At the heart of this issue is the distinction between two types of statements which may serve as evidence of a declarant's state of mind: 1) those which are not hearsay because they are not offered for the truth of the matter asserted; and 2) those which are hearsay because they are offered for their truth, but which are nevertheless admissible because they meet the requirements of the state of mind exception to the hearsay rule. *See generally* L. PACKEL AND A. POULIN, PENNSYLVANIA EVIDENCE § 801–4, 803(3)–1 (2d ed.1999) [hereinafter "PACKEL AND POULIN, PENNSYLVANIA EVIDENCE"]; 2 MCCORMICK ON EVIDENCE §§ 269, 273–276 (5th ed.1999) [hereinafter "MCCORMICK ON EVIDENCE"]. In my view, failure to recognize this distinction has engendered considerable confusion in our decisional law and, for that reason, warrants discussion here, even though I would ultimately conclude that the issue does not entitle Appellant to relief.

### A.  Homicide

The Commonwealth contends that the victim's statements were relevant to the murder charge because they revealed the victim's perception of her relationship with Appellant and, inferentially, Appellant's intent and motive.  Use of the statements for this purpose is problematic, however.  While Pennsylvania law permits the admission of evidence of prior incidents, within the context of a marital relationship as well as elsewhere, in which the accused threatened, assaulted, or quarreled with the decedent, for the purpose of proving ill will, motive, or malice, such evidence remains subject to the general rules of competency and relevance.  *See Commonwealth v. Ulatoski,* 472 Pa. 53, 60–61, 63, 371 A.2d 186, 190, 191 (1977).

1060; *Commonwealth v. Chmiel,* 558 Pa. 478, 504, 738 A.2d 406, 420 (1999), *cert. denied,* 528 U.S. 1131, 120 S.Ct. 970, 145 L.Ed.2d 841 (2000).  The more difficult issue, discussed *infra,* involves the admissibility of the victim's statements to the PFA court.

Among the rules of competency is the hearsay rule. *See Commonwealth v. Myers*, 530 Pa. 396, 401, 609 A.2d 162, 165 (1992).

### 1. The Statements as Non–Hearsay

The Commonwealth argues that the statements in question were not hearsay relative to the homicide charge because they were not offered for their truth, but only to show the victim's state of mind. Such an assertion, without more, would be fatal to the Commonwealth's argument, since the *victim's* state of mind (with narrow exceptions, discussed *infra*) is considered irrelevant to a murder prosecution. *See Laich,* 566 Pa. at 27, 777 A.2d at 1061; *Commonwealth v. Auker,* 545 Pa. 521, 547, 681 A.2d 1305, 1319 (1996) (citing *Commonwealth v. Thornton,* 494 Pa. 260, 431 A.2d 248 (1981)); *see also Woods v. State,* 733 So.2d 980, 987 (Fla.1999) (observing that "a homicide victim's state of mind prior to the fatal event generally is neither at issue nor probative of any material issue raised in the murder prosecution"). To overcome this obstacle, the Commonwealth contends, and the majority agrees, that the victim's state of mind, as revealed by the purportedly non-hearsay statements, was evidence of the contentious state of the marital relationship, and, in turn, the malice which the victim perceived in the relationship was probative of Appellant's intent and motive.

There are circumstances in which a person's out-of-court assertion may be relevant to his or her state of mind even though it is patently untrue. *See, e.g.,* MCCORMICK ON EVIDENCE § 274 (suggesting, as an example, when an individual whose sanity is at issue is heard to proclaim, "I am King Henry the Eighth"). This is not such a case. The victim's PFA statements shed no light upon Appellant's motive or intent unless they are considered as evidence, not merely of the victim's mental impressions, but of Appellant's actual conduct. Only if it is assumed that the assertions made in the PFA application are true, and that Appellant had indeed threatened the victim with harm in the past, do those asser-

tions reveal anything about Appellant's subsequent intent and motive.

In sum, the Commonwealth cannot credibly argue both relevance and non-hearsay. *See* Gordon Van Kessel, *Hearsay Hazards in the American Criminal Trial: An Adversary–Oriented Approach*, 49 HASTINGS L.J. 477, 537 n. 250 (Mar. 1998) (describing such an approach as "merely a circuitous way of using the statement to prove defendant's conduct"). To conclude otherwise is to ignore the distinction between "non-hearsay statements which circumstantially indicate a present state of mind regardless of their truth, and hearsay statements which indicate a state of mind because of their truth." Christine Arguello, *The Marital Discord Exemption to Hearsay: Fact or Judicially Created Fiction?*, 46 U. KAN. L. REV. 63, 79 (Nov.1997) [hereinafter, "Arguello, *The Marital Discord Exemption* "] (quoting *Betts v. Betts*, 3 Wash.App. 53, 473 P.2d 403, 407 (1970)). If the victim's statements were to be in any way relevant, they had to be offered for their truth, and therefore they were hearsay, inadmissible unless encompassed by the state of mind or other exception to the hearsay rule.[2]

## 2. The Statements as Hearsay

Courts of other jurisdictions have generally ruled against the admissibility, within the state of mind exception to the hearsay rule, of evidence of the defendant's prior threats against the victim. As the Court of Appeals for the District of Columbia explained in *United States v. Brown*, 490 F.2d 758 (D.C.Cir.1973), a statement by the victim which inferentially implicates the defendant, even if introduced solely for the

---

2. The Commonwealth suggests that the evidence in question should be considered reliable because it was contained in a sworn statement. Notably, however, Pennsylvania has not adopted the hearsay exception for public records and reports, *see* Pa.R.E. 803(8), or the residual exception, *see* Pa.R.E. 803(24). Although Section 6104 of the Judicial Code provides a hearsay exception for public records, the statute refers to "a record of governmental action or inaction," 42 Pa.C.S. § 6104(a), and "a record ... disclosing the existence or nonexistence of facts which have been recorded pursuant to an official duty ...," 42 Pa.C.S. § 6104(b). Thus, a PFA application, even though verified, would not come within the purview of Section 6104.

purpose of showing the victim's state of mind and accompanied by a limiting instruction to that effect, entails the risk of severely prejudicing the defendant.

> While such statements are admittedly of some value in presenting to the jury a complete picture of all the facts and circumstances surrounding the homicide, ... [they] are fraught with inherent dangers and require the imposition of rigid limitations. The principal danger is that the jury will consider the victim's statement of fear as somehow reflecting on defendant's state of mind rather than the victim's— i.e., as a true indication of defendant's intentions, actions, or culpability. Such inferences are highly improper and where there is a strong likelihood that they will be drawn by the jury the danger of injurious prejudice is particularly evident.

*Id.* at 765 (footnotes and citations omitted). McCormick has specified the dangers arising from such statements: "[t]he possibility of overpersuasion, the prejudicial character of the evidence, and the relative weakness and speculative nature of the inference ...." MCCORMICK ON EVIDENCE § 276.[3]

The root of these dangers, as various commentators have noted, is that statements of prior threats have but a tenuous connection to the "underlying components of trustworthiness" which form the premise for admitting state of mind evidence. *See* Reagan F. McClellan, Note, *State v. Alston: North Carolina Continues to Broaden Its Mind to Admissibility of a*

**3.** A minority of jurisdictions permit the use of statements indicating "ill will" between the defendant and the victim on the theory that such statements are sufficiently probative of the defendant's intent and motive to overcome the likelihood of unfair prejudice to the defendant. *See State v. Alston,* 341 N.C. 198, 461 S.E.2d 687, 704 (1995) (rejecting the "strict rule" of *Brown,* and holding that the murder victim's statements were properly admitted "pursuant to the state of mind exception to the hearsay rule to show the nature of the victim's relationship with the defendant"), *cert. denied,* 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996); *see also State v. Mayberry,* 248 Kan. 369, 807 P.2d 86, 99 (1991) (holding that the murder victim's statements were not inadmissible hearsay because they were not introduced to prove the truth of the matter asserted, but to show the victim's state of mind and the discordant nature of her relationship with the defendant). These decisions have been roundly criticized. *See infra.*

*Victim's Out–of–Court Statements Under the Rule 803(3) Hearsay Exception in Criminal Cases,* 32 WAKE FOREST L. REV. 1327, 1356 (1997) [hereinafter "McClellan, *State v. Alston* "]; Arguello, *The Marital Discord Exemption,* at 76. The principal component of the trustworthiness of state of mind evidence is its spontaneity and the resulting probability that, being spontaneous, it is also sincere. *See* McClellan, *State v. Alston,* at 1356; MCCORMICK ON EVIDENCE § 274. A victim's statements concerning threats previously made by the defendant, in contrast, constitute "statements of the victim's memory about the past, not statements of her then-existing state of mind." *Cole v. State,* 307 Ark. 41; 818 S.W.2d 573, 577 (1991); *see also State v. Bell,* 950 S.W.2d 482, 484 (Mo.1997) (*en banc* ) (declaring that the victim's hearsay testimony concerning past abuse "was not a declaration of her state of mind[, but instead] was pure narration of past acts by another"). That such statements look to the past rather than the present lessens their trustworthiness. *See Commonwealth v. Fletcher,* 561 Pa. 266, 304, 750 A.2d 261, 282 (2000) (Saylor, J., concurring), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000); McClellan, *State v. Alston,* at 1356. So, too, does the victim's use of narration. *See Brown,* 490 F.2d at 775. The more closely the evidence bears upon the fundamental question of the defendant's guilt or innocence, and the more narration of the defendant's past acts is included in the evidence, the greater the risk of prejudice. *See id.* at 766, 775; *see also* Arguello, *The Marital Discord Exemption,* at 76 (asserting that such evidence "presents all of the traditional hearsay dangers because the victims' memories, perceptions, and sincerities cannot be tested").

As a result of these concerns, courts have generally limited the admissibility of statements such as those at issue here to situations in which the victim/declarant's mental state is directly at issue in the case. *See, e.g., Bell,* 950 S.W.2d at 483. Most commonly, courts permit the use of extrajudicial statements by the victim when the defendant has alleged that he acted in self-defense or that the death was the result of suicide or accident. *See Woods,* 733 So.2d at 987; *State v. Bauer,* 598

N.W.2d 352, 367 (Minn.1999). In such instances, the increased relevancy of the evidence may outweigh the possibility of prejudice. *See Brown,* 490 F.2d at 767.[4]

None of the above circumstances was present in this case. To the contrary, the ultimate purpose for which the Commonwealth offered the victim's statements—to serve as evidence of Appellant's intent and motive—is precisely the purpose that is generally considered impermissible. Nevertheless, the Commonwealth argues, and the majority concludes, that the decisional law of Pennsylvania permits the admission of such evidence.

There is some support for the Commonwealth's position. *See Commonwealth v. Fletcher,* 561 Pa. 266, 293–94, 750 A.2d 261, 275–76 (2000) (holding that the victim's assertion that he had used a package of drugs belonging to the appellant was admissible under the state of mind exception as evidence of the appellant's motive); *Commonwealth v. Chandler,* 554 Pa. 401, 411, 721 A.2d 1040, 1045 (1998) (holding similarly); *Commonwealth v. Collins,* 550 Pa. 46, 58–60, 703 A.2d 418, 424–25 (1997) (holding similarly), *cert. denied,* 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998); *see also Commonwealth v. Puksar,* 559 Pa. 358, 368, 740 A.2d 219, 225 (1999) (holding that similar evidence was admissible as non-hearsay, as it was offered to establish the appellant's motive and not for its truth), *cert. denied,* 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 42 (2000).

---

**4.** As the *Brown* court explained:

When [self-defense] is asserted, a defendant's assertion that the deceased first attacked him may be rebutted by the extrajudicial declarations of the victim that he feared the defendant, thus rendering it unlikely that the deceased was in fact the aggressor in the first instance.... [W]here defendant seeks to defend on the ground that the deceased committed suicide, evidence that the victim had made statements inconsistent with a suicidal bent are highly relevant. A third situation involves a claim of accidental death .... In such cases the deceased's statements of fear ... (showing he would never go near defendant under any circumstances) are relevant in that they tend to rebut this defense.

*Id.* at 767 (footnotes omitted).

There is case law supporting the contrary position as well. In *Myers*, the trial court admitted out-of-court statements by the victim that the appellant/husband had beaten her on several occasions. *See Myers*, 530 Pa. at 399, 609 A.2d at 164. This Court reversed, observing that, while evidence concerning the relationship between the victim and the appellant was relevant to prove the appellant's malice and motive, such evidence remained subject to the general rule of competency. *See id.* at 400, 609 A.2d at 165. The Court specifically held that there is no special exception to the hearsay rule for statements regarding marital relationships and that such testimony was not subject to a relaxed standard of admissibility. *See id.* at 401, 609 A.2d at 165. Finding that no hearsay exception applied, the Court ruled that admission of the statements had been error. *See id.*[5] *See also Thornton*, 494 Pa. at 264–65, 431 A.2d at 250–51 (reasoning that the victim's statement, that he was carrying a gun because he feared the appellant, was inadmissible under the state of mind exception because, to be probative of the appellant's intent, the statement had to be considered for its truth, and, thus considered, it was hearsay not within any exception).[6]

In sum, this Court's decisional law concerning the state of mind exception is inconsistent. In my view, such inconsistency should be resolved by avoiding the expansion of the state of mind exception in the context of assertions by the victim concerning the status of his or her pre-existing relationship with the defendant. To do otherwise, as I have previously suggested, is to risk the "traditional hearsay dangers of fabrication, faulty memory and incorrect narration[,]" *Fletcher*, 561 Pa. at 304, 750 A.2d at 281 (Saylor, J., concurring), and,

**5.** The majority's reliance upon *Myers* to support the admission of the statements in this case is misplaced. *See* Majority Opinion, at 118. While *Myers* holds that evidence of previous discord in the marital relationship may be relevant to prove motive, it clearly states that such evidence is subject to hearsay restrictions. *See id.* at 401, 609 A.2d at 164–65.

**6.** Arguably the *Thornton* Court's analysis did not accurately reflect the facts of the case: since the appellant had argued self-defense and provocation, *see id.* at 262, 431 A.2d at 249, the statement may have been admissible as evidence of the *victim's* state of mind.

in addition, the possibility that the hearsay exception will consume the rule, *see id.*[7]

Moreover, only a conservative interpretation of the state of mind exception, in my view, will comport with the understanding of the exception expressed in our recently adopted Rules of Evidence.[8] Specifically, Rule 803(3) ("Then Existing Mental, Emotional, or Physical Condition") lifts the hearsay bar for:

[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. A statement of memory or belief offered to prove the fact remembered or believed is included in this exception only if it relates to the execution, revocation, identification, or terms of declarant's will.

Pa.R.E. 803(3). Because the assertions contained in the PFA application recite threats made by the defendant in the past, they are statements of memory, which, except in will contests, are inadmissible under Rule 803(3).

Accordingly, I would find that the victim's statements were not admissible to establish Appellant's intent or motive (the purpose for which the trial court instructed the jury to consid-

7. More than one commentator has noted that a great many homicides involve a victim/defendant relationship of some kind, and, once homicide has ensued, the argument is easily made that the status of the relationship is relevant to the defendant's intent and motive. *See* McClellan, *State v. Alston*, at 1355; Arguello, *The Marital Discord Exemption*, at 64. Recognizing this danger, the United States Supreme Court has observed that:

[d]eclarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored.

*Shepard v. United States*, 290 U.S. 96, 106, 54 S.Ct. 22, 26, 78 L.Ed. 196 (1933).

8. The Rules of Evidence went into effect on October 1, 1998, applicable to all trials, hearings, and proceedings beginning on or after that date. As the hearing on Appellant's suppression motion was not held until January 5, 1999, and the jury trial commenced immediately thereafter, the Rules of Evidence are controlling. Moreover, Rule 803(3) was assumed to be consistent with the existing decisional law. *See* Pa.R.E. 803(3) cmt.

er them). I would find their admission harmless, however, as the jury learned of Appellant's prior threats against the victim through the testimony of various witnesses. *Cf. Laich,* 566 Pa. at 28, 777 A.2d at 1062 (rejecting harmless error analysis where, *inter alia,* the appellant's state of mind was at issue, and the challenged hearsay testimony was the only evidence of the appellant's prior threats to kill the victim). It is on this basis, therefore, that I join the majority's disposition of this issue.

## B. Burglary

To convict Appellant of burglary, the Commonwealth was required to prove, *inter alia,* that Appellant had entered the victim's residence while not licensed or privileged to do so. *See* 18 Pa.C.S. § 3502. The relevance to that element of the burglary offense of evidence of the victim's state of mind, and in particular her willingness, *vel non,* to allow Appellant to enter her home, is readily apparent. Nevertheless, the backward-looking assertions contained in the PFA application are no more endowed with the components of trustworthiness in this context than in the previous one. In addition, their marginal probative value may be even less, as they merely supplement the fact that the victim applied for a PFA order against Appellant the day before the murder—in itself, powerful evidence that she would not have been inclined to allow him into her home the next day. Accordingly, I would find that the victim's statements should not have been admitted because their prejudicial effect was greater than their probative value, *see* Pa.R.E. 403, but that their admission was harmless given the properly admitted evidence of the prior threats.

## II. Aggravating Circumstance

I also agree with the majority's conclusion that the aggravating circumstance relating to the existence of a PFA order is not applicable unless the defendant has been given actual notice of the order or possesses equivalent knowledge of its terms. Contrary to the majority's determination that there was no evidence that Appellant had knowledge of the PFA

order, however, I would find that sufficient evidence was presented by the Commonwealth to create a question of fact for the jury as to whether Appellant was aware of the court order restricting his contact with the victim.

The Commonwealth offered substantial evidence of Appellant's awareness of the order, including: the testimony of Appellant's girlfriend, Evelyn Weidman, indicating that she had discussed the implications of a PFA order with Appellant on the night prior to the murder; Weidman's further testimony that she had overheard a telephone conversation between Appellant and the victim discussing an order against him; and the transcript of the telephone conversation between Appellant and the police in which he acknowledged the existence of a court order restricting his right to see his daughter. Accordingly, upon remand for a new sentencing hearing, I would permit the Commonwealth to present the evidence indicating that Appellant knew he was subject to the PFA order and would require the court to issue proper instructions to the jury indicating the circumstances under which it could find the existence of this aggravating factor.

Mr. Justice NIGRO joins this concurring and dissenting opinion.