38 A.3d 785

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Andre STATON, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 2011.

Decided Feb. 21, 2012.

488

Thomas N. Farrell, Farrell & Kozlowski, Pittsburgh, for Andre Staton.

Richard A. Consiglio, Blair County District Attorney's Office, Hollidaysburg, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Chief Justice CASTILLE.

This Court reviews the direct appeal of appellant Andre Staton from the sentence of death imposed on June 1, 2006, following a jury trial before the Honorable Elizabeth Doyle of the Blair County Court of Common Pleas. Appellant raises a single claim of error related to the penalty phase of his trial. For the reasons that follow, we affirm the conviction and judgment of sentence.

Appellant was charged with a single count of criminal homicide, two counts of aggravated assault, and one count each of burglary, criminal trespass, receiving stolen property, and theft by unlawful taking, in connection with the stabbing death of Beverly Yohn. The Commonwealth issued a notice to appellant that it would be seeking the death penalty based on the aggravating factors that the killing occurred while in the perpetration of a felony (criminal trespass), 42 Pa.C.S. § 9711(d)(6), and at the time of the killing, appellant was subject to a court order restricting his behavior towards the victim, 42 Pa.C.S. § 9711(d)(18).[1]

At trial, the Commonwealth established that appellant began dating Beverly Yohn in the Spring or Summer of 2003. In the Fall of 2003, one of Ms. Yohn's friends observed injuries to Ms. Yohn. In late January of 2004, Ms. Yohn called the police alleging that appellant had struck her. After the incident, Ms. Yohn filed a Protection From Abuse ("PFA") petition against appellant and on January 27, 2004 a temporary PFA order was entered against him. Subsequently, a

1. The Commonwealth initially indicated that it was also pursuing the aggravating circumstance that the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8). The Commonwealth withdrew this aggravator prior to trial.

PFA hearing was held on February 19, 2004 (before Judge Doyle). At the conclusion of the hearing, a final PFA order was entered against appellant.

On February 24, 2004, appellant was at the 10th Street Café, a bar in Altoona at 6 p.m. He left and returned there at 9 p.m. where he drank for two hours and talked to Lynn McDonough, the bartender, about "his girlfriend." He said he had peeked in her windows the night before. Appellant also told the bartender that he gave Ms. Yohn "forty thousand dollars ($40,000) for a house and now he can't live in the house," but stated it "will be taken care of." N.T., 4/27/2006, at 134–136.

On the morning of February 25, 2004, at 6:40 a.m., appellant was observed in a parked car in front of 212 Third Street, Altoona, approximately a block and a half from Ms. Yohn's mother's residence, located at 228 Third Avenue. At that time Ms. Yohn was staying at her mother's residence with her three sons. Ms. Yohn's son, Justin, was outside the residence starting a car in order for his mother to drive him to school. Penny Lantz, Justin's grandmother, had earlier left the house for work. Justin saw appellant run up to the residence. Appellant put his finger to his lips, indicating that Justin was to be quiet. Appellant then entered a rear porch and kicked in the back door. Justin saw appellant come out a short time later, whereupon appellant threw Justin from the car and drove away in it. N.T., 4/28/2006, at 108–118.

Meanwhile, Jeremy Yohn, another son of the victim, was in the kitchen. Jeremy saw his mother lock the back door and, shortly thereafter, saw appellant kick in the back door and enter the kitchen. Jeremy testified that appellant opened his jacket and pulled out a knife with his left hand. Immediately after pulling out the knife, appellant began stabbing Ms. Yohn until she fell to the floor. Appellant then left the residence through the back door. N.T., 4/28/2006, at 146–159.

Ms. Yohn was taken to the Altoona Hospital Trauma Center with a large knife still protruding from her back. She was later pronounced dead that day. Dr. Vimal Mittal testified at trial as an expert witness in forensic pathology and that, in his

opinion within a reasonable degree of medical certainty, the cause of Ms. Yohn's death was multiple stab wounds to the heart and left jugular vein, with cardiac tamponade,[2] and that the manner of her death was homicide. N.T., 4/27/2006, at 122–127.

Appellant testified at trial. He admitted that he stabbed Ms. Yohn, and caused her death, but denied that he had gone to the residence with the intent to harm her. Instead, he claimed that it was Ms. Yohn who had the knife in her hand and began "swinging at him"; the next thing he remembered was seeing Ms. Yohn with blood coming out of her mouth. N.T., 5/1/2006, at 26–29.

On May 2, 2006, a jury convicted appellant of all charges, including first-degree murder. Following the penalty phase of trial, the jury found both aggravating circumstances and found four mitigating circumstances under the "catchall" mitigator at 42 Pa.C.S. § 9711(e)(8)—appellant's childhood circumstances, his polysubstance abuse, his medical history, and his potential for good. The jury further found that the aggravating circumstances outweighed the mitigating circumstances and returned a sentence of death. *See* 42 Pa.C.S. § 9711(c)(1)(iv). The sentence of death was formally imposed by Judge Doyle on June 1, 2006. The trial court sentenced appellant further to forty-eight to ninety-six months of imprisonment for burglary and a consecutive term of twelve to twenty-four months for theft by unlawful taking.[3]

Appellant filed post-sentence motions which were denied by opinion and order dated June 25, 2007. Appellant filed this direct appeal to this Court on July 24, 2007.[4] *See* 42 Pa.C.S. § 9711(h). On appeal, appellant raises a single issue:

**2.** Cardiac tamponade was described at trial as "bleeding to the heart." N.T., 4/27/2006, at 127.

**3.** The trial court originally sentenced appellant on the aggravated assault and criminal trespass counts, but later determined the sentences merged after considering the arguments by trial counsel. The above reflects the final sentencing court order, which was entered on June 5, 2006.

**4.** The delay in this matter was occasioned by the numerous prior appellate counsel, who were appointed to represent appellant, but later

Whether the Commonwealth proved beyond a reasonable doubt that at the time of the killing [appellant] was subject to a court order restricting his behavior towards the Victim pursuant to 42 Pa.C.S. § 9711(d)(18).

*See* Brief for Appellant at 5.

## I. *Sufficiency of the Evidence*

■ Although appellant does not raise a challenge to the sufficiency of the evidence to support his conviction for first-degree murder, this Court *sua sponte* reviews the evidence in all capital cases to ensure that the evidence is sufficient to support the first-degree murder conviction, whether or not sufficiency is challenged by the appellant. *Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24, 37–38 (2011).

■ In considering the sufficiency of the evidence for a first-degree murder conviction, this Court must ascertain whether the evidence introduced at trial and all reasonable inferences derived from that evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to establish beyond a reasonable doubt the elements of first-degree murder. Our standard of review is *de novo* and our scope of review is plenary. *Id.*

■ First-degree murder is an intentional killing, *i.e.,* a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused

withdrew or were removed by court order. Appellant's current counsel, Thomas Farrell, Esquire, is appellant's seventh appellate counsel in this matter, *see Commonwealth v. Staton ("Staton I ")*, 608 Pa. 404, 12 A.3d 277, 277–78 and n. 1 (2010).

The issue before this Court in *Staton I* involved Attorney Farrell's Motion to Withdraw based on his allegation that appellant had sent correspondence to him "terminating" his representation. Mr. Farrell believed that appellant's correspondence created an obligation to move to withdraw, but further recommended that we not grant appellant's request. We denied counsel's request to withdraw under *Commonwealth v. Rogers*, 537 Pa. 581, 645 A.2d 223, 224 (1994), and directed him to file his direct appeal brief, which is now the subject of this appeal.

acted with malice and specific intent to kill. The jury may infer the intent to kill based upon the accused's use of a deadly weapon on a vital part of the victim's body. *Sanchez,* 36 A.3d at 37 (*citing* 18 Pa.C.S. § 2501(a), 2502(a), (d) and related case law).

There is no doubt that Ms. Yohn was killed and that appellant caused her death. The murder was witnessed by Ms. Yohn's son Jeremy; at trial, appellant admitted to stabbing Ms. Yohn; and the Commonwealth's forensic expert testified that her death resulted from the stabbing and that the manner of her death was homicide. N.T., 4/27/2006, at 127. Thus, the only remaining question is whether the evidence was sufficient to establish beyond a reasonable doubt that appellant acted with malice and specific intent to kill.

Jeremy Yohn testified that he saw appellant pull a knife from his coat, a fact that supports an inference that appellant went to the residence with the intent to harm Ms. Yohn, which is precisely what he did, as Jeremy bore witness to seeing appellant stab his mother multiple times. A DNA expert testified that a broken knife handle found in the kitchen contained a mixture of Ms. Yohn's and appellant's DNA. N.T., 4/29/06, 124–26. When Ms. Yohn was taken to the hospital, a large knife was still protruding from her back. The forensic expert called by the Commonwealth testified that Ms. Yohn was stabbed in the heart and the left jugular vein, causing her death. Based on the circumstances surrounding this killing, including appellant's uninvited entry into the victim's home while armed with a deadly weapon, which he proceeded to use multiple times on the victim, the jury was fully warranted in concluding that the killing was with malice and with the specific intent to kill. The record supports appellant's conviction for first-degree murder.

## II. *42 Pa.C.S. § 9711(d)(18)*

The only issue raised by appellant relates to the penalty phase of his trial and contests whether the Commonwealth proved beyond a reasonable doubt the aggravating circumstance that at the time of the killing appellant was subject to a

court order restricting his behavior towards the victim, 42 Pa.C.S. § 9711(d)(18).

Appellant challenged the Commonwealth's use of the (d)(18) aggravator pre-trial and the trial court held a hearing on the question. At the hearing, the Commonwealth presented the testimony of Deborah Moeller and Timothy Case, both friends of Ms. Yohn. The trial court did not rule immediately on the question, but delayed deciding the issue until the penalty phase of the trial "if it ever comes to that." *See* N.T., 3/31/2006, at 30. Following completion of the guilt phase and the jury's first-degree murder verdict, the trial court announced that it had considered the standard set forth in *Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110 (2001), and concluded that the (d)(18) aggravator could be submitted to the jury. N.T., 5/2/2006, at 95.[5] Appellant renews his argument on appeal to this Court.

The genesis of appellant's argument is this Court's decision in *Stallworth*, which held that the subsection (d)(18) aggravator applied only where the Commonwealth proves that the defendant had "actual notice or ha[d] the equivalent knowledge of a PFA order so as to be 'subject to' such an order." *Stallworth*, 781 A.2d at 124. Appellant also cites *Commonwealth v. Padilla*, 885 A.2d 994 (Pa.Super.2005), a decision from the Superior Court defining circumstances when the defendant could be deemed to have equivalent knowledge of a PFA "even in the absence of personal service." *Id.* at 996.

Relying upon these two cases, appellant avers that he was not notified of the final PFA order and that he was under the reasonable belief that Ms. Yohn had withdrawn her petition at the final PFA hearing. In appellant's view, the evidence was insufficient to create a jury question concerning his knowledge

5. The trial court issued an order dated April 12, 2006, stating that "[a]ny remaining issue contained in the Defendant's Omnibus Pre-trial Motion for Continuance or supplemental Motion in Limine is denied and dismissed." However, it is unclear whether the trial court meant to dispose of the subsection (d)(18) issue by the April 12, 2006 order, since it definitively addressed it on the day before the penalty phase was to begin, as set forth herein.

of the PFA. In support of his argument, appellant cites the following testimony from trial.

Appellant notes that he entered into a stipulation at trial as follows: a temporary PFA was entered against him on January 27, 2004; a judge held a hearing on February 19, 2004 related to the entry of a final PFA order; at the conclusion of that hearing a final PFA order was entered; and there was no court order rescinding, vacating, or modifying the PFA order. The stipulation further provided "there is no physical evidence in the record that any of the three above-mentioned documents were personally served on [appellant]. However, the record reflects unsuccessful attempts at said service." N.T., 5/1/2006, at 2–3.

According to appellant, the transcript of the February 19, 2004 PFA hearing reflects that he did not attend the hearing and Ms. Yohn indicated that she did not think he had notice of the hearing. N.T., 2/19/2004, at 1 (PFA hearing). He further alleges that he understood that Ms. Yohn was going to withdraw the petition. Appellant points out that the transcript of the hearing reflects that Ms. Yohn stated that she wanted to withdraw the PFA petition. However, appellant acknowledges that she did not withdraw the petition and the order remained in full force and effect.

Appellant also cites the trial testimony of Ms. Yohn's friend, Deborah Moeller, who explained that she took Ms. Yohn to talk to appellant after the PFA order had been entered and further stated that she did not know whether Ms. Yohn and appellant were still living together. Ms. Moeller testified that Ms. Yohn told Moeller that she informed appellant about filing the PFA petition, but never told him about the PFA order.

Appellant also references the testimony of the police officer who responded to a domestic disturbance call placed by Ms. Yohn on January 26, 2004, the day before she obtained the temporary PFA order. Appellant focuses on the officer's statement that appellant was angry at being asked to leave his house. On cross-examination, the officer admitted he made no effort to determine who owned the house and further testified

that "there wasn't any court order or anything actually that legally prevented" appellant from contacting Ms. Yohn at that time. N.T., 4/27/2006, at 90–91.

Appellant next summarizes the testimony of Lynn McDonough, the bartender at the 10th Street Café, who had spoken with appellant the night before the murder. Ms. McDonough testified that appellant told her that he had given his girlfriend $40,000 to buy a house that he "can't live in." N.T., 4/27/2006, at 136.

Appellant also cites the testimony of Ms. Yohn's mother, Penny Lantz, who testified that Ms. Yohn had been living with her for five days before the murder. Before that, Ms. Yohn had been staying at the First Avenue residence [6] and that she had moved because of her fear of appellant. Ms. Lantz testified to seeing appellant on her back porch two nights before the murder. She stated that she picked up the phone and pretended to be dialing the police, at which point appellant fled. However, Lantz did not call the police because "Beverly did not want Andre to go to jail." N.T., 4/28/2006, at 61. On cross-examination, Ms. Lantz stated that Ms. Yohn tried to withdraw the PFA petition.

Appellant also details the testimony of Michael Skinner, Ms. Yohn's former boyfriend, prior to appellant. Appellant claimed that he saw Mr. Skinner leaving Ms. Lantz's house when he was driving by the house the night before the murder. Mr. Skinner, however, denied being at the house. On cross-examination, Mr. Skinner stated that he told the police that Ms. Yohn had a PFA order against appellant, but testified that he believed appellant had not been served with the PFA. Mr. Skinner also testified that he spoke with Ms. Yohn on the day of her murder because she was having problems in her relationship with appellant.

Finally, appellant notes his own testimony at trial, pointing out that he was living with Ms. Yohn and her three children [7]

6. The First Avenue residence is where Ms. Yohn and appellant resided together before the PFA was issued.

7. Ms. Yohn's third son, Jordan, who was six-years old at the time of her murder, did not testify at trial.

until February 22, 2004. Appellant testified that he was depressed and was self-medicating with drugs and alcohol. Further, appellant admitted that Ms. Yohn told him about the PFA, but he claimed he did not know what it meant:

> She mentioned something about a PFA but never said anything about a PFA where you couldn't be around her. I did not know the definition of PFA because I had never heard of such ... that's not what they have in Maryland, it's not called a PFA, so I had no idea what a PFA was and she mentioned that she was going to get a PFA but I didn't question her so I had no idea exactly what exactly it was."

N.T., 5/1/2006, at 17. Appellant further claimed that Ms. Yohn met him two nights before the murder and that they began to "make out in the car." Appellant also denied contacting Dorothy Winfield[8] or discussing the PFA with the bartender of the 10th Street Café. Appellant testified that Ms. Yohn told him that the PFA hearing was discontinued.

Appellant also acknowledges that the Commonwealth presented the testimony of Winfield to rebut his testimony that he was unaware of the PFA order. Ms. Winfield testified that an individual identifying himself as "Andre Staton" called her on February 17, 2004, asking whether he needed to attend a PFA hearing. She testified that she told the caller that he could lose all of his rights if he did not attend the hearing. Winfield stated that the caller told her that the victim was going to withdraw the petition, but Winfield explained that it was up to the court whether to accept the withdrawal. Ms. Winfield stated that she did not remember if she told the caller the date or time of the hearing. On cross-examination, she admitted that on her report of the phone call, she had written "new hearing date, February 26, 2004." N.T., 5/1/2006, 62–68.

Finally, appellant references the penalty phase testimony of Timothy Case, Ms. Yohn's friend, regarding a call Case placed to appellant on February 5, 2004. Mr. Case further testified

8. Dorothy Winfield was employed by Family Service Incorporated at the PFA Office in the Blair County Courthouse.

that he told Ms. Yohn to tell appellant that she had a PFA order against him as follows:

> Bev was reluctant to call Andre to inform him about the PFA and I kept telling her you have to let him know that this has been filed so I dialed the number. Andre answered the phone. I said Andre [sic] Bev needs to talk you [sic]. I gave Bev the phone. She said Andre I filed a PFA. She hung the phone up, that was the end of the conversation.

N.T., 5/3/2006, at 30.

Appellant claims that the above testimony demonstrates that he was unaware of the outcome of the February 19, 2004 hearing and he believed that the PFA was withdrawn at the hearing. Appellant notes that all of the attempts to serve him with the PFA occurred prior to the February 19th hearing, and that Ms. Yohn told him that the proceeding was discontinued. Appellant claims that the above evidence merely establishes that he was given notice of the order prior to the February 19th hearing. Appellant further contends that the evidence showed that he continued to meet and/or speak with Ms. Yohn. According to appellant, the fact that Ms. Yohn moved in with her mother after the final PFA order was entered does not prove that he knew of the final PFA order; nor does the fact that he was looking into the windows at Ms. Lantz's residence establish that he knew of the final PFA order. Likewise, appellant avers that Ms. McDonough's testimony was consistent with the fact that he was removed from their house on January 26, 2004 (during the domestic disturbance call), rather than being removed by court order. Instead, according to appellant, he continued to live in the First Avenue house and was never told to leave it. In conclusion, appellant avers that the facts show that he was never served with the final PFA order, and that he did not have "anecdotal knowledge of the order 'restricting in any way his behavior towards the victim,'" *citing Stallworth*, 781 A.2d at 126. Accordingly, appellant argues that the jury's finding of the (d)(18) aggravator was unsupported by the evidence, and he is entitled to a new penalty phase hearing, since there were

mitigating factors found by the jury, and because of this the improper aggravator affected the jury's penalty verdict.

The Commonwealth has filed a brief response. The Commonwealth recounts much of the same testimony set forth by appellant, but draws a different conclusion from that testimony. The Commonwealth asserts that the evidence showed that appellant knew that Ms. Yohn had obtained a PFA order against him, since she told him on two separate occasions that she had done so, citing the testimony of Case and Moeller. The Commonwealth also points to the fact that appellant admitted that he hid from the Sheriff, who was attempting to serve him with the PFA order. Furthermore, the Commonwealth looks to Ms. Winfield's testimony as evidence that appellant knew there was an order against him. Winfield's testimony also demonstrated that appellant was told that the PFA court could refuse to withdraw the order irrespective of Ms. Yohn's wishes. The Commonwealth avers that appellant's conduct in fleeing from Ms. Lantz's porch when she pretended to call the police was guilty conduct reflecting that appellant knew there was a PFA order against him. Finally, the Commonwealth points to the testimony of Ms. McDonough, the bartender of the 10th Street Café, as evidence that appellant knew of the PFA order.

The Commonwealth also contends that the jury properly could conclude that appellant's self-serving testimony, that he believed that Ms. Yohn was going to withdraw the PFA order, was incredible since it was unsupported by other evidence. For all of these reasons, the Commonwealth concludes that the evidence, when viewed in the light most favorable to the Commonwealth, established beyond a reasonable doubt that appellant had knowledge of the existence of the PFA order at the time he murdered Ms. Yohn.

The trial court concluded that the testimony elicited from the witnesses at trial, in particular that of Ms. Winfield, established that appellant knew of the PFA order. The trial court also found that the jury was free to reject appellant's testimony as incredible in relation to the totality of the evidence. Accordingly, the trial court rejected appellant's

argument related to the (d)(18) aggravator. *See* Trial Court Opinion, 6/25/2007, at 16–17.

The death penalty statute enumerates a list of aggravating circumstances that can be presented to a jury and, when pursued, must be proven by the Commonwealth beyond a reasonable doubt. *See* 42 Pa.C.S. § 9711(c)(1)(iii), (d). Subsection 9711(d)(18) provides an aggravating circumstance where a defendant is subject to a PFA order, as follows:

At the time of the killing the defendant was subject to a court order restricting in any way the defendant's behavior toward the victim pursuant to 23 Pa.C.S. Ch. 61 (relating to protection from abuse) or any other order of a court of common pleas or of the minor judiciary designed in whole or in part to protect the victim from the defendant.

42 Pa.C.S. § 9711(d)(18).

In *Stallworth*, this Court was called upon to interpret the language of subsection (d)(18) and determine whether the phrase "subject to" in subsection (d)(18) required proof that the defendant had actual knowledge of the PFA order in order for the aggravator to apply. This Court found that the phrase was not clear and free from ambiguity, but was capable of several different meanings. In resolving the ambiguity, we noted that penal statutes are to be strictly construed, and, in circumstances involving a sentence of death, "strict construction should militate in favor of the least inclusive interpretation." *Stallworth*, 781 A.2d at 124 (citation omitted). Therefore, we concluded that subsection (d)(18) required a defendant "either be given actual notice or have the equivalent knowledge of a PFA order" in order to be "subject to" the aggravator. *Id.*

The *Stallworth* Court then applied this standard to the facts before it to determine whether the evidence was sufficient to present the aggravator during the penalty phase to the jury. We found that, even though Stallworth had knowledge that the victim had obtained some type of court order restricting his rights regarding his daughter, the evidence did not show that Stallworth understood that the order related to protection

of the victim. Rather, the testimony at trial tended to establish that Stallworth believed the victim had obtained a court order that restricted access to his daughter. Accordingly, "because Appellant was never served with notice of the PFA order, which had only been issued fewer than twenty-four hours before the killing, and because he did not have anecdotal knowledge [9] of the existence of an order ... he was not 'subject to' such order for purposes of the aggravating circumstance set forth at 9711(d)(18)." *Id.* at 126. We remanded for a new penalty phase hearing.[10]

This Court has not had the occasion to revisit or further construe the *Stallworth* holding, but the Superior Court employed the *Stallworth* Court's analysis in a different context in *Padilla, supra.* The question presented in *Padilla* was whether a telephone conversation with a police officer was adequate to convey notice that a PFA order had been entered against a defendant for purposes of a conviction for indirect criminal contempt. Analogizing the situation to *Stallworth,* the Superior Court concluded that the conversation, during which the defendant was informed of the order and the repercussions of violating it, were sufficient under *Stallworth* as constituting actual notice or its equivalent, even in the absence of personal service of the actual order. *Padilla,* 885 A.2d at 997.

Turning to the instant case, there is no dispute that appellant was never served formally with the temporary or final PFA orders. However, the evidence demonstrated that the sheriff attempted to serve appellant with the temporary PFA order, but appellant avoided that service. The question in this case is whether there was sufficient evidence that appellant had the equivalent knowledge or anecdotal knowledge of the PFA order to raise a jury question as to proof of

9. The *Stallworth* Court referred to "equivalent knowledge" and "anecdotal knowledge" interchangeably.

10. Our decision in *Stallworth* was not unanimous. Mr. Justice Saylor, joined by Mr. Justice Nigro, filed a concurring and dissenting opinion. On this issue, Justice Saylor noted that he would have found that the evidence was sufficient to present a jury question regarding the existence of the aggravator.

the aggravator. In our view, the evidence, summarized above, clearly supported a jury finding that appellant had the equivalent knowledge or anecdotal knowledge of the temporary PFA order. In any case, civil or criminal, party admissions or confessions are not required to establish necessary facts. Evidence of conduct, circumstantial evidence, and logical inferences may suffice to prove certain facts.

In this case, the evidence demonstrated that appellant deliberately avoided the authorities, who were attempting to serve him with the order. Moreover, two witnesses testified that Ms. Yohn specifically told appellant of the order, and the conversation between Ms. Winfield and a person identifying himself as appellant supported a jury finding that appellant had some knowledge of the order. Finally, appellant's conduct when the victim's mother feigned calling the police corroborated his knowledge, or the jury could so find. Appellant was free to forward his claim of studied ignorance, but the jury was not required to accept it; and appellant's demeanor and credibility in forwarding his claim, which the jury could assess (and an appellate court cannot recreate or second-guess), properly could factor into its conclusion. Accordingly, the evidence was sufficient to establish that appellant had equivalent knowledge of the PFA order.

However, this is not the end of the inquiry, since appellant takes his argument one step farther, and asks this Court to parse out a distinction between the temporary and the final PFA order based on his self-serving testimony at trial—that he believed that the temporary PFA order was withdrawn; that Ms. Yohn told him the PFA proceedings were discontinued; and that he did not know a final order was ever entered. Although appellant sets forth his argument in terms of a question of law under *Stallworth,* nothing in *Stallworth* supports such a distinction, nor are we inclined to craft one. Instead, *Stallworth* set forth the legal standard as simply being whether the Commonwealth proved beyond a reasonable doubt that appellant had actual knowledge or its equivalent of the PFA order and then applied that standard to determine whether the evidence was sufficient to present the (d)(18)

aggravator to the jury. As found by the trial court below, appellant's argument here is really a challenge to the weight the jury gave his testimony regarding his belief that no final PFA order had been entered. Appellant would like this Court to credit his testimony over the testimony of the other witnesses. This is not our duty, nor is it within our prerogative. *See Sanchez,* 36 A.3d at 39 ("The finder of fact—here, the jury—exclusively weighs the evidence, assesses the credibility of witnesses, and may choose to believe all, part, or none of the evidence.").

We recognize that the transcript of the February 19th PFA hearing provides some foundation for appellant's testimony, since Ms. Yohn initially attempted to withdraw the petition on that date. But, the jury was provided with the transcript of the hearing and heard testimony provided by appellant and other witnesses. As the finder of fact, the jury was free to believe all, some, or none of appellant's testimony. *Sanchez, supra.* Accordingly, we do not find that *Stallworth* precluded the Commonwealth from presenting the (d)(18) aggravator for the jury's consideration, as a matter of law, and the trial court's decision to permit the jury to consider to this aggravator was not erroneous.

## III. *Statutory Review*

Having rejected appellant's claim for relief, we now turn to the independent penalty review mandated by statute, 42 Pa. C.S. § 9711(h)(3). Section 9711(h)(3) provides that "[t]he Supreme Court shall affirm the sentence of death unless it determines that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)." Our review of the record reveals that the sentence of death in this case was not the product of passion, prejudice or any other arbitrary factor, but was based upon the record. In addition, the evidence presented was sufficient to support the jury's finding

of the aggravating circumstances of murder committed during the perpetration of a felony (criminal trespass), 42 Pa.C.S. § 9711(d)(6), and at the time of the killing, appellant was subject to a court order restricting his behavior towards the victim, 42 Pa.C.S. § 9711(d)(18). Accordingly, we will not disturb the sentence of death.

For these reasons, appellant's judgment of sentence is affirmed.[11]

Justices SAYLOR, EAKIN, BAER, TODD, McCAFFERY and ORIE MELVIN join the opinion.

11. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).