J-S84018-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DAVID LESLIE BARKSDALE | : | |
| | : | |
| Appellant | : | No. 201 MDA 2017 |

Appeal from the Judgment of Sentence December 9, 2016
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0003560-2015

BEFORE:  SHOGAN, J., LAZARUS, J., and OTT, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED MARCH 06, 2018**

David Leslie Barksdale appeals from his judgment of sentence, entered in the Court of Common Pleas of Dauphin County, after a jury found him guilty of first-degree murder.  Upon careful review, we affirm.

The trial court set forth the facts of this case as follows:

On June 25, 2014, Officer Duane Pyles responded to a dispatch call indicating there was a previously reported missing person and a strange odor in a basement.  He and his partner arrived at the scene and[,] upon knocking on the door, were greeted by two residents of the home, as well as a stench that made it clear to him that there was something dead in the home.  One of the residents, David Barksdale, indicated he believed he had seen an ankle in the back of the basement.  Suffice it to say, Officer Pyles made his way to the basement and saw maggots crawling away from the back corner.  Officer Pyles thought he saw something under a board so[,] using his baton[,] he lifted the board a bit and saw what he recognized as a human joint.  Officer Pyles and his partner backed out of the basement and called a supervisor to the scene.

The body was identified as [83-year-old] Peggy Swann. She had previously been reported missing by Barksdale. On June 8, 2014, Barksdale and a few friends got into an argument. Barksdale was called names and[,] in defending himself[,] indicated that he was sleeping with Ms. Swann, amongst others. The friends, Bonita Crummel and Michelle Black, were concerned and called Ms. Swann to ask if she was sleeping with Barksdale. She told them she was but it was not by choice. They agreed on a course of action that included meeting with Peggy the following day and reporting this to the Dauphin County Area Agency on Aging (hereinafter "[Agency]"). Then they told Barksdale that they were reporting him to [the Agency]. Barksdale was angry and yelled at them and then hung up the phone. They called back several times to no avail.

They did make the report to [the Agency] on June 9, 2014; however, because they were unable to make contact with Peggy, they did not go to the planned meeting. [The Agency] then went out to make contact with Peggy; however, they were unable to locate her. In the late night of June 9 or early June 10, Barksdale called Bonita Crummel to tell her that Peggy was missing.

Trial Court Opinion, 5/9/17, at 1-2 (citations to record omitted).

Approximately nine months after Swann's body was discovered, Barksdale was arrested and charged. A jury trial was held on December 7-9, 2016, at which time the Commonwealth proceeded on the theory that Barksdale murdered Swann because he was aware that the Agency was about to begin an investigation into the nature of his sexual relationship with the victim, as well as possible financial abuse. Barksdale was found guilty of first-degree murder on December 9, 2016, and the court sentenced him that same day to a term of life imprisonment. Barksdale's post-sentence motions were denied and this timely appeal followed. Both Barksdale and the trial court have complied with Pa.R.A.P. 1925.

On appeal, Barksdale raises the following issues for our review:

1. Did not the [trial] court err in barring [Barksdale] from fully presenting his third-party-guilt defense by preventing [the] introduction of the named third-party's recent conviction for aggravated assault against a female victim and by restricting the relevance of the [third party's] recent robbery convictions?

2. Did not the [trial] court err in overruling [Barksdale's] objection to irrelevant evidence describing the district attorney's and police's motive in deciding on the timing of the filing [of] the instant homicide charges?

3. Did not the [trial] court err in denying [Barksdale's] motion *in limine* to bar the introduction of irrelevant evidence regarding his engaging in sex – either consensual or non-consensual – with the 83-year-old [victim]?

4. Did not the [trial] court err in denying [Barksdale's] motion *in limine* to exclude reference to [the victim's] statements by two Commonwealth witnesses when such statements constituted hearsay not admissible under any exception?

5. Did not the [trial] court abuse its discretion by failing to grant [Barksdale] a new trial on the basis that the guilty verdict was against the weight of the evidence when the totality of the evidence on the core issues of the trial was unreliable, contradictory, and incredible?

Brief of Appellant, at 5-6.

Barksdale first claims that the trial court erred in precluding him from introducing evidence of a third party's recent conviction for a similar crime and by limiting the purpose for which evidence of that third party's recent robbery convictions could be used. For the following reasons, his claim is meritless.

Our standard of review is well-settled:

The admissibility of evidence is within the sound discretion of the trial court, and this Court will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion will not be found based

on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Alicia*, 92 A.3d 753, 760 (Pa. 2014) (internal citations omitted).

"A defendant has a fundamental right to present evidence provided that it is relevant and not subject to exclusion under one of our established evidentiary rules." *Commonwealth v. McGowan*, 635 A.2d 113, 115 (Pa. 1993). "It is well established that evidence which tends to show that the crime for which an accused stands trial was committed by someone else is relevant and admissible." *Id.* (citations omitted).

At trial, Barksdale's defense was based largely on his assertion that an individual named Benjamin Palmer actually killed Swann during the course of a robbery. Palmer testified at trial that he had gone to Swann's house on the day she disappeared, but had left when she did not answer her door. Another witness, a neighbor of Swann, contradicted Palmer's testimony, testifying that he had seen Palmer exiting Swann's back door on that date.

On July 19, 2014, just over a month after Swann disappeared, Palmer was arrested for multiple robberies, one of which included an aggravated assault. In 2015, Palmer pled guilty to those charges. At trial, Barksdale sought to introduce evidence regarding the robberies, and particularly the one involving the aggravated assault, because they were proximate in time to Swann's murder and the latter offense involved "levels of similarity," in that

robbery was a motive and it involved facial injury to a female victim. Brief of Appellant, at 43.

The trial court precluded Barksdale from presenting evidence regarding the aggravated assault/robbery under an established rule of evidence, specifically Pa.R.E. 404(b), and limited the use of the robbery convictions to impeachment of Palmer for *crimen falsi* pursuant to Pa.R.E. 609.

Rule 404(b) provides, in pertinent part, as follows:

(b) Crimes, Wrongs or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2). This rule deals exclusively with the evidence of crimes, wrongs or acts which a party seeks to admit to prove something about an accused, a complainant or a witness. *Commonwealth v. Thompson*, 779 A.2d 1195, 1201 (Pa. Super. 2001). "[E]vidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, is admissible when proffered for some other relevant purpose so long as the probative value outweighs the prejudicial effect." *Commonwealth v. Hicks*, 156 A.3d 1114, 1125 (Pa. 2017), cert. denied sub nom. *Hicks v.*

*Pennsylvania*, 138 S.Ct. 176 (2017) (citations omitted).  In this case, Palmer appeared as a witness and, as such, his testimony was subject to the limitations imposed by Rule 404(b).

However, our courts have "long recognized an exception to the general inadmissibility of other crimes evidence where there is a striking similarity— or logical connection—between the proffered prior bad acts and the underlying charged crime." *Id.*  In *Commonwealth v. Palagonia*, 868 A.2d 1212 (Pa. Super. 2005), this Court held that:

> [C]riminal defendants are entitled to offer evidence that some other person committed a similar crime at or around the same time they are alleged to have committed a crime.  Evidence to establish this fact is admissible after consideration of two distinct factors that coalesce to establish its relevance and probative value.  *Commonwealth v. Nocero*, [] 582 A.2d 376 ([Pa. Super.] 1990)[.]  Those factors are:  (1) the lapse of time between the commission of the two crimes; and (2) the resemblance between the methodologies of the two crimes.  *Id.* at 378.  Thus, even if the time lapse between commission of the crimes is brief . . ., the evidence is not admissible unless the nature of the crimes is "so distinctive or unusual as to be like a signature or the handiwork of the same individual." *Id.*

*Palagonia*, 868 A.2d at 1216.

Barksdale argues that the normal evidentiary rules, in particular Rule 404(b) and the "signature crime" exception, "cannot be applied with equal force to the admission of third-party-guilt evidence by a criminal defendant without offending the constitutional rights identified in *Holmes v. South Carolina*, [547 U.S. 319 (2006)]." Brief of Appellant, at 41.  In *Holmes*, the defendant was prosecuted for the beating, rape, robbery, and murder of an

elderly woman.  The prosecution relied heavily on forensic evidence, including a palm print, fiber evidence, and DNA evidence, as well as testimony that the defendant had been seen near the victim's home within an hour of the fatal attack.  As part of his defense, Holmes sought to introduce evidence that the state's forensic evidence had been contaminated or tampered with in an attempt to frame him.  He also sought to introduce testimony from several witnesses who had either seen a third party in the victim's neighborhood on the morning of the crime, or had heard the third party acknowledge his own guilt in the crime.

The trial court excluded the third-party-guilt evidence on the basis of a South Carolina Supreme Court case, **State v. Gregory**, 16 S.E. 2d 532 (S.C. 1941), which held that third-party-guilt evidence is admissible if it raises a reasonable inference or presumption as to the defendant's own innocence, but not if it merely "casts bare suspicion upon another." **Id.** at 324.  The South Carolina Supreme Court affirmed, relying on **Gregory**, as well as a subsequent case, **State v. Gay**, 541 S.E. 2d 541 (S.C. 2001).  In **Gay**, the South Carolina court drastically extended the rule in **Gregory** by looking not only at whether the proffered defense evidence raised a reasonable inference or presumption of innocence, but also at the strength of the prosecution's case.  Because the state presented "strong" evidence of Gay's guilt – in particular, strong forensic evidence – the court concluded that Gay's proffered evidence did not raise the necessary reasonable inference of innocence and, thus, excluded the evidence.

The U.S. Supreme Court reversed. In doing so, the Court noted several prior cases in which it had overturned state rules excluding defense evidence on the basis that they were "'arbitrary' rules, i.e., rules that excluded important defense evidence but that did not serve any legitimate interests." *Holmes*, 547 U.S. at 325. The Court concluded its survey of prior cases by stating:

> [w]hile the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Id.* at 326.

Turning to the South Carolina rule first enunciated in *Gay* and applied in the South Carolina Supreme Court to bar Holmes' evidence, the Court noted that:

> Under [the *Gay*] rule, the trial judge does not focus on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt. Instead, the critical inquiry concerns the strength of the prosecution's case: If the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues.

*Id.* at 329. The Court went on to hold that

> by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt. Because the rule applied by the [South Carolina] Supreme Court in this case did not heed this point, the rule is "arbitrary" in the sense

that it does not rationally serve the end that the ***Gregory*** rule and other similar third-party guilt rules were designed to further.

***Id.*** at 331. As such, the Court concluded the rule "violates a criminal defendant's right to have 'a meaningful opportunity to present a complete defense.'" ***Id.***, citing ***Crane v. Kentucky***, 476 U.S. 683, 690 (1986).

In light of the Court's holding in ***Holmes***, Barksdale posits that the proffered evidence of Palmer's guilt is admissible as evidence of third-party guilt, even if it would otherwise be excludable under Rule 404(b) and even if it does not rise to the level of the "signature crime" exception as explained in ***Palagonia***. Barksdale is entitled to no relief.

In Barksdale's view, ***Holmes*** essentially eviscerates the rules of evidence as applied to defense evidence. Barksdale's reading is overbroad. Rather than giving defendants carte blanche to present any third-party-guilt evidence "unless it is remote or speculative," Brief of Appellant, at 41, ***Holmes*** merely invalidates those state evidentiary rules that exclude pivotal defense evidence without serving any legitimate state interest or that are disproportionate to the ends they are designed to promote.

Here, the "signature crime" exception to Rule 404(b) serves the legitimate end of excluding evidence of a witness's prior bad acts unless there is a close factual nexus sufficient to demonstrate the relevance of the prior bad acts to the crime in question. In the absence of such a rule, a defendant could present tenuous, speculative, or remote evidence of another's guilt, not necessarily probative of his own innocence, and possibly tending to confuse

the issues and mislead the jury. Accordingly, the "signature crime" exception does not violate the rule set forth in **Holmes** and may be applied to bar Barksdale's evidence. We now consider whether the evidence was properly excluded.

Here, when compared to the instant victim's murder, Palmer's crimes were not "so distinctive or unusual as to be like a signature." **Palagonia**, **supra**. Barksdale's defense theory was that Palmer – who admitted to being at the victim's house on the day she disappeared – murdered the victim during a "robbery gone bad." To that end, Barksdale sought to introduce evidence of Palmer's prior convictions for robberies and an aggravated assault that occurred near the time of the victim's disappearance and murder. Specifically, during one of Palmer's robberies, he chased the female victim into a bathroom at knifepoint and she ended up with scratches on her face. Palmer was convicted of aggravated assault for this incident. Because the female victim in this matter received traumatic injuries to the face, Barksdale asserts that there were sufficient "levels of similarity" with the prior crimes that the evidence should be admitted as proof of third-party guilt. We disagree.

First, there was no evidence presented to show that the victim in the instant case was robbed, or that robbery was a motive for the crime. Second, although the victim in this matter had injuries to her face, they were significantly more serious and extensive than scratches. The victim suffered 30 rib fractures, facial fractures, all caused by blunt force trauma, and a fracture to the hyoid bone, caused by strangulation. Third, Palmer did not

murder any of his robbery victims, while the victim in this case was strangled to death. In sum, the only similarity between Palmer's prior offenses and the instant crime was that the victims were all female. This fact, alone, does not establish similarities that are "so distinctive or unusual as to be like a signature or the handiwork of the same individual." ***See id.*** Accordingly, the trial court did not err or abuse its discretion in excluding evidence of Palmer's conviction for aggravated assault and limiting the use of his robbery convictions to impeachment for *crimen falsi*.

Next, Barksdale claims that the trial court erred in overruling his objection to testimony by Detective Jason Paul explaining the timing of the filing of the homicide charges in this matter. In particular, Barksdale objects to testimony by Detective Paul that he and the prosecutor decided to file charges when they did because Barksdale had been making threats to witnesses Tracy Lynn Mitchell and Kathy DeHaven and Detective Paul "thought it was unsafe to have him out there with his threats."[1] N.T. Trial, 12/8/16, at

---

[1] Detective Paul had not arrested Barksdale earlier because he had been cooperating with the police and continued to speak to them. Detective Paul testified as follows:

> [DET. PAUL]: Every time we'd ask him to come down, he would. He was holdin' press conferences and talkin', He was leavin' voice mails for us. So if he wanted to keep talkin', we'd keep listenin'.
>
> Q: And that — is that a very valuable investigative tool, the words of the prime suspect?

879. Barksdale argues that the testimony amounts to vouching for the veracity of Mitchell and DeHaven and references Detective Paul and the prosecutor's personal belief that Barksdale was an actual threat to Mitchell and DeHaven. Barksdale argues that the testimony was irrelevant and inadmissible under Pa.R.E. 401 and 402. Barksdale is entitled to no relief.

As the trial court conceded in its Rule 1925(a) opinion, Detective Paul's testimony as to why he arrested Barksdale when he did was irrelevant. However, any error on the part of the trial court in not sustaining Barksdale's objection was harmless. Both Mitchell and DeHaven testified, without objection, to the threats made to them by Barksdale. Such evidence of a defendant's threats against a Commonwealth witness is admissible to demonstrate consciousness of guilt. **Commonwealth v. Markle**, 361 A.2d 826, 831 (Pa. Super. 1976); **see also Commonwealth v. Jones**, 658 A.2d 746, 748 (Pa. 1995). Moreover, we do not agree that Detective Paul's brief reference to his concern for the safety of Mitchell and DeHaven amounted to "vouching" for their general veracity as witnesses. It is a police officer's job to take allegations of witness intimidation seriously and, as the trial court

_____

A: Yes. I mean, a lot of times we can't talk to our prime suspects. They don't want to talk to us. He was calling and wantin' to talk to us any time. So if he wanted to talk, I would listen.

Q: The more he talks, the better for you?

A: Yes.

N.T. Trial, 12/8/16, at 878.

reasoned, "it is the logical conclusion that a jury would make had the testimony been [simply] that he was arrested after the neighbors came to police." Trial Court Opinion, 5/5/17, at 9. Accordingly, this claim merits no relief.

We address Barksdale's next two claims together, as they both involve his assertion that the trial court erred in denying his motion *in limine* to bar the introduction of evidence regarding his sexual relationship with the victim. The Commonwealth sought to introduce the evidence as proof of motive to kill the victim; specifically, that Barksdale killed the victim because the Agency commenced an investigation based on allegations that Barksdale was coercing the victim into a sexual relationship. Barksdale asserts that the evidence was hearsay, irrelevant, and unfairly prejudicial, arguing that

> the subject matter of sexual relations between Mr. Barksdale and [the victim] – even consensual relations – engenders an emotional reaction based on hatred and contempt. There was a 34-year difference in their ages. Even at the earliest stage of their relationship, [the victim] was already a senior citizen (71[]years[-]of[-]age) and Mr. Barksdale was still relatively youthful (37[]years[-]of[-]age). Although consensual relations between such persons is lawful, it is so outside the norm of common experience that it approaches the level of "taboo."

Brief of Appellant, at 50. Barksdale argues that unfair prejudice could have been minimized by permitting the Commonwealth to prevent evidence that the Agency was investigating "abuse" generally, but omit reference to the sexual nature of the allegations.

Under Pennsylvania Rules of Evidence 801 and 802, an out-of-court statement is inadmissible as hearsay if it is being offered to prove the truth of the matter asserted in the statement. Pa.R.E. 801, 802. However, an out-of-court statement is not hearsay when it has a purpose other than to convince the fact finder of the truth of the statement. *Commonwealth v. Busanet*, 54 A.3d 35, 68 (Pa. 2012). A statement is not hearsay when it is offered to show the effect on the listener. *Id.* Moreover, an out-of court statement by a murder victim may be admitted to establish the motive of the defendant when those statements are not offered to prove the truth of the matter asserted. *Commonwealth v. Stallworth*, 781 A.2d 110, 118 (Pa. 2001).

Similarly, evidence of a defendant's prior bad acts may be admissible to demonstrate motive under Rule 404(b)(2).[2] The admission of such evidence is within the sound discretion of the trial court, and will be reversed only upon a showing of an abuse of that discretion. *Id.*, citing *Commonwealth v. Miles*, 681 A.2d 1295, 1304 (Pa. 1996). Evidence concerning the relationship between the defendant and the victim may be relevant and admissible to prove ill will, malice, or motive. *Id.*, citing *Commonwealth v. Myers*, 609 A.2d 162, 164 (Pa. 1992).

---

[2] Under Rule 404(a), evidence of a crime, wrong, or other act is inadmissible to prove a person's character or tendency to behave in accordance therewith. However, under Rule 404(b), such evidence is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident, where the probative value of the evidence outweighs its potential for unfair prejudice.

Here, the trial court properly admitted the evidence of Barksdale's sexual relationship with the victim as relevant and admissible to demonstrate his motive to kill her. Furthermore, the victim's hearsay statement to Crummel and Black that she was sleeping with Barksdale against her will was admissible to show its effect on the listeners. Specifically, the victim's statement provided the impetus for Crummel and Black to contact the Agency, which, in turn, provided motive for Barksdale to silence the victim by killing her. The court provided a limiting instruction to the jury, directing it not to consider the evidence of the sexual relationship for its truth, but, rather, only as evidence of why the Agency began an investigation. *See* N.T. Trial, 12/5/16, at 149. Accordingly, we can discern no abuse of discretion on the part of the trial court in admitting the evidence in question for the above limited purposes.

Finally, Barksdale claims that the trial court abused its discretion by failing to grant him a new trial on the basis that the verdict was against the weight of the evidence, where the totality of the evidence on the core issues of the trial was unreliable, contradictory, and incredible. Barksdale argues that testimony from two jailhouse informants was "questionable," the purported motives suggested by the Commonwealth were actually negated by its own evidence at trial, and the Commonwealth presented "inconsistent and irreconcilable evidence regarding the nature of the actions that caused the [victim's] injuries and ultimately her death." Brief of Appellant, at 60. Specifically, Barksdale argues that the Commonwealth proceeded under the

theory that Barksdale pushed the victim down the stairs and then strangled her, which was corroborated by the jailhouse informants, Ian Munz and Corey Williams. However, he alleges that the Commonwealth's forensic anthropologist, Dennis Dirkmaat, Ph.D., testified that the victim's injuries were not consistent with falling down stairs. Barksdale further asserts that the Commonwealth's suggested motive regarding the abuse report to the Agency is negated because witnesses confirmed that his sexual relationship with the victim dated as far back as 2002, and he admitted the nature of his relationship with the victim to the Agency. Finally, Barksdale asserts that the Commonwealth failed to preserve and test evidence at the crime scene, and that testimony regarding the victim's date of death was inconsistent. He is entitled to no relief.

We evaluate challenges to the weight of the evidence under settled precepts:

> [W]e may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.
>
> ***Commonwealth v. Champney***, [] 832 A.2d 403, 408 ([Pa.] 2003) (citations omitted). Hence, a trial court's denial of a weight claim "is the least assailable of its rulings." ***Commonwealth v. Diggs***, [] 949 A.2d 873, 880 ([Pa.] 2008). Conflicts in the evidence and contradictions in the testimony of any witnesses are for the fact finder to resolve. ***Commonwealth v. Tharp***, [] 830 A.2d 519, 528 ([Pa.] 2003). As our Supreme Court has further explained,

- 16 -

> A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice."

*Commonwealth v. Widmer*, [] 744 A.2d 745, 752 ([Pa.] 2000) (citations omitted).

*Commonwealth v. Lofton*, 57 A.3d 1270, 1273 (Pa. Super. 2012).

Here, the trial court denied Barksdale's motion for a new trial and concluded that the verdict did not shock its sense of justice. Our review of the record confirms the court's finding. The jury was able to view the testimony of the various witnesses, determine the weight to be given to each witness's testimony, and to believe all, part or none of the evidence as it deemed appropriate. Viewed in its entirety, the evidence of record is neither so unreliable nor contradictory as to undermine the verdict. While Dr. Dirkmaat testified that he "might" have expected to see certain injuries that were not present had the victim fallen down the stairs, *see* N.T. Trial, 12/7/16, at 638, he also noted that he did not know the exact context of where and how the victim may have fallen down the stairs.[3] Both the Commonwealth's

---

[3] The following exchange took place at the end of Dr. Dirkmaat's direct examination:

[ATTORNEY FALBO]: And if I could just ask one more question, I'll pose a hypothetical for you.

Say you have an 83- year-old female, falls down the stairs or slips down the stairs, and then someone were to kneel on her chest and strangle her. Would the injuries of blunt-force trauma to the ribs be similar? And the broken hyoid bone, could that cause that?

ATTORNEY GROSS: Judge, I'm sorry. I'd object to that. He has already testified that he doesn't address cause or manner of death, which is the answer the DA is seeking to elicit.

THE COURT: I think she's asking in a hypothetical manner whether or not that would have been caused the blunt-force trauma that this victim suffered. I will allow him to answer.

THE WITNESS: In terms of the injuries to the chest and the hyoid, again, the injuries to the chest indicate sort of a broad impact that's sort of higher up on the chest and more to the left. So even in our report, we talk about that, that that could be somebody with weight kneeling on this individual who's osteoporotic, 150 pounds, something that — I don't know the number of forces, but that seems reasonable.

The hyoid is most likely that it's not a car crash or anything like that. So manual strangulation is consistent — this damage is consistent with that.

And then the facial fractures would be — we don't have enough to say anything about an instrument or anything like that, but there's significant forces there. Whether it's from a fist or an instrument or a foot or something like that, we can't really tell.

The other aspect of your question, about falling down the steps, I would expect if it's — I don't know the context. But if it's a long stairway and an osteoporotic, elderly individual, you might see other — other fractures, maybe to ribs or, you know, in the attempts to set yourself. People falling get a lot of what they call Colles fractures and things like that, and we didn't see any of that. And there were no random rib fractures that might not — that could be explained by that.

experts agreed that strangulation was the likely cause of death. This conclusion is consistent with the testimony of jailhouse informants Munz and Williams, who also corroborated the Commonwealth's suggested motive, as well as the manner in which Barksdale attempted to hide the victim's body. Finally, Barksdale's admission to the Agency that he engaged in a sexual relationship with the victim does not negate the Commonwealth's suggested motive. Regardless of his admission, the death of the victim eliminated any possibility that she might formally accuse him of unwanted sexual contact. Her death left Barksdale's self-serving statements immune to refutation by the victim, thus extinguishing his potential criminal exposure.

In sum, any conflicts in the evidence and contradictions in the testimony of any witnesses were for the fact finder to resolve, ***Tharp***, ***supra***, and we can discern no abuse of discretion on the part of the trial court in concluding that the verdict does not shock one's sense of justice. ***Champney***, ***supra***.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/06/2018

---

ATTORNEY FALBO: Thank you.

N.T. Trial, 12/7/16, at 637-38.

- 19 -