J-S14031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ALEXIS BROLIN | : | |
| | : | |
| Appellant | : | No. 1233 WDA 2022 |

Appeal from the Judgment of Sentence Entered August 18, 2022
In the Court of Common Pleas of Cambria County Criminal Division at
No(s):  CP-11-CR-0000171-2021

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED: JUNE 26, 2023**

Alexis Brolin (Brolin) appeals from the judgment of sentence imposed in the Court of Common Pleas of Cambria County (trial court) after his bench conviction of one count of disorderly conduct, 18 Pa.C.S. § 5503(a)(4).  Brolin argues that the court erred in denying his motion to change venue/recuse and in precluding and limiting his presentation of certain witnesses; that the evidence was insufficient to support his conviction; and that his conviction was against the weight of the evidence.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

**A.**

The trial court aptly set forth the pertinent background facts of this matter in its December 14, 2022 opinion:

> The charge against Brolin arose from an incident that occurred at the Cambria County Prison (CCP) on October 2, 2020, in which the inmates in housing unit B (B Block), including Brolin, refused orders to "lock-in" and seized control of the housing. The seizure of B Block resulted in an hours long standoff involving emergency response teams from the CCP, the Pennsylvania Department of Corrections (DOC), and Cambria County. In addition, hostage negotiators from the CCP and DOC responded, along with local law enforcement and other first responders. Eventually the inmates surrendered to authorities and order was restored.

(Trial Court Opinion, 12/14/22, at 2).

On May 27, 2022, the trial court issued an order scheduling the matter for a waiver trial. Brolin filed a motion for change of venue on June 7, 2022, and the court held a hearing on June 15, 2022. At that time, Brolin requested that his motion be treated as a motion to recuse because he sought to disqualify all Cambria County judges from presiding over his bench trial. He argued that since all the witnesses in this case were Cambria County employees and there was a working relationship between the bench and the CCP, no Cambria County jurist could be unbiased in this matter. The Commonwealth responded that it believed the judges were capable of being impartial and that the evidence would consist of corrections officers' (CO) testimony and the video surveillance of the incident.

Brolin did not offer any evidence to support his allegation that the Cambria County trial judge could not be fair and impartial in this matter or point to any decision in his case that called into question the court's impartiality. The court denied Brolin's motion, concluding that it was able to be impartial, and that the working relationship between the bench and the CCP staff would not cause a significant minority of the community to question the Court's impartiality.

**B.**

The trial court describes that at the one-day August 18, 2022 trial:

> … Lieutenant Mark Sanford (Sanford) testified that he was the shift commander on October 2nd when he was summoned to B Block by another [CO] who reported that the inmates had refused multiple orders to lock-in.[a] The lock-in order had been given in preparation to move the inmates from B Block's dormitory unit to C Block which consisted of individual cells. The move was part of an effort by prison officials to minimize the risk of spreading COVID-19 among the prison population by limiting inmate contact and enforcing social distancing. The second block had become available when the inmates housed there were transferred to various state correctional institutions as part of COVID-19 mitigation procedures.
>
>> [a] B Block is a dormitory style housing unit without individual cells[;] [a] lock-in order directs inmates to return to their bunks and vacate the block's common areas.
>
> Sanford testified that he went to B Block with a response team equipped with various chemical weapons including pepper spray, pepper foam, and firearms equipped to fire pepper balls. Once there Sanford ordered the inmates to lock-in and prepare to move blocks and the inmates failed to comply with that order. Sanford and the other COs exited the block to regroup. Sanford and his officers reentered B Block and gave a final order for the inmates to lock-in. This order was refused and the officers

deployed various chemical weapons in an effort to gain compliance. In response the inmates began throwing items at the officers and the situation quickly deteriorated to the point that Sanford ordered his officers out of B Block. The inmates then secured the doors to the block by tying sheets to the door handles. Sanford then called for the prison to go into lockdown and for the deployment of the CCP's emergency response team. Sanford testified that eventually both the DOC and Cambria County emergency response teams arrived on scene to aid in efforts to secure the surrender of the inmates. Various local law enforcement agencies and other first responders also arrived to provide assistance and secure the area around the prison.

Sanford testified that when he entered B Block Brolin was seated at a round table in the common area near where Sanford was standing making him one of the closest inmates to the officers. Sanford testified that Brolin: had clearly not complied with the order to lock-in; refused to comply with either of Sanford's orders to lock-in; began yelling at Sanford and the COs after the final order was given; and continued to yell directly at Sanford after the chemical weapons were deployed. A video was played during Sanford's testimony that showed the surveillance videos recorded during the incident which corroborated Sanford's testimony regarding Brolin's actions.

(Trial Ct. Op., at 2-3).

The misconduct report authored by Lieutenant Sanford stated, in pertinent part, that:

After this Lieutenant gave the unit multiple orders to lock in[,] inmate Brolin quickly joined other Inmates refusing to comply and began yelling. Inmate Brolin was one of the most vocal and loudest inmates at this time. Inmate Brolin was instigating and encouraging other inmates not to comply. The situation quickly escalated to the point the team had to back out and a Code 3 was called. …

(Defendant's Exhibit 6, Stanford Misconduct Report, at 1) (some capitalization omitted).

- 4 -

## C.

Brolin called CCP Warden Christian Smith, Captain George Rozum, Jessica Greathouse, on cross and stated his intent to call Cambria County Detective William Hines and CCP CO Zachary Shuhayda.

## 1.

To show that his actions on October 2, 2020, served a legitimate purpose, Brolin called Warden Smith, the chief administrator at the CCP to testify about the CCP's response to the Covid-19 pandemic. After sustaining the Commonwealth's objection based on relevance, the court limited Warden Smith's testimony to the time period up to and including October 2, 2020.

Warden Smith testified that as of October 2, 2020, there were positive Covid-19 cases in all male housing units, including B and C Blocks. To reduce the spread of Covid-19, they were moving inmates from the open dormitory B Block to the closed cells of C Block. He explained that there was no written Covid-19 policy at that time, but they were following the directives of the DOC and PrimeCare Medical. Covid-19 counseling was provided by PrimeCare Medical and there were postings about Covid-19 throughout the units. (**See** Defense Exhibit 2, Covid-19 Postings). He detailed that the whole prison was sanitized on September 24, 2020, a memo was sent to inmates with CCP's

Covid-19 mitigation procedures on September 25, 2020,[1] (*see* Defense Exhibit 3, Covid-19 Mitigation Procedures Memo, 9/25/20), the staff was tested for Covid-19 at their discretion on September 26, 2020, and voluntary mass testing of the prison population started on September 28, 2020. Inmates who refused testing were put in isolation for everyone's safety.

Warden Smith stated he had personnel who went to the units every day to answer questions and talk with the inmates. When asked about the white shirt[2] request made on October 2, 2020, Warden Smith said inmates requested to talk to white shirts every day. There was a system in place in which the inmates could request information using CCP tablets and he had never heard of anyone being unable to use his access code in order to do this. (*See* N.T. Trial, 8/18/22, at 25-26, 31-42).

**2.**

The court limited Captain Rozum's testimony to what occurred on October 2, 2020, agreeing with the Commonwealth that the proposed testimony about his participation in the internal disciplinary proceedings

---

[1] The memo/bulletin was sent to inmates weekly. When the defense attempted to ask Warden Smith about a memo sent after the October 2, 2020 incident, the court sustained the Commonwealt's objection. Warden Smith stated that the memo sent after the incident was the same as the previous memos sent prior to it.

[2] According to the trial court, "a 'white shirt' refers to a supervisor or higher ranked CO and [the term] is derived from their uniform shirts being white." (Trial Ct. Op., at 10 n.4).

following the incident was irrelevant. Captain Rozum testified that he did not respond to the scene until sometime after the riot, so his investigative reports were based on his review of a surveillance video. Because the surveillance video did not have any audio, he utilized time stamps for reference. The report indicates that the video showed Brolin sitting at the round table near the officer's desk with other inmates apparently playing cards. He stayed seated at the table until after chemical munitions were deployed. At that point, Brolin rose from the table and appeared to speak to Lieutenant Sanford. He then started up the stairs, continuing to say something to staff. Thereafter, Brolin mostly stayed on the top tier during the riot and was not involved in throwing items or causing destruction to the unit. (*See id.* at 43-44); (Defense Exhibit 5, Rozum Incident Report, at 1-2).

**3.**

Jessica Greathouse, a counselor at the CCP and member of the hostage negotiator team, testified on cross that she and another negotiator spoke with inmates to resolve the October 2, 2020 situation. She encountered Brolin, who told her he was a federal inmate, but she did not remember any other details of their conversation. (*See* N.T. Trial, at 46-51).

**4.**

Brolin stated his intent to call Detective Hines, who reported to the incident after it had concluded. Defense counsel wanted Detective Hines to testify about his investigation into the riot and his resulting report in which he

made a statement that one reason for the incident was that the inmates were upset over the Covid-19 situation. The Commonwealth objected since Detective Hines "responded after the fact" and, therefore, any testimony about what had occurred would be hearsay and irrelevant. (N.T. Trial, at 27). The trial court took judicial notice that Covid-19 was a serious concern throughout Cambria County in October 2020 and that there were administrative orders "outlining how the courts and everybody was operating." (N.T. Trial, at 30). The court directed that any reports could come in through Warden Smith and deferred ruling on the Commonwealth's objection to Detective Hines. Ultimately, Brolin did not introduce Detective Hines's report or call Detective Hines as a witness, so the court made no ruling on the Commonwealth's objection and whether he could testify. (*See id.* at 26-27, 29-30).

**5.**

Brolin sought to call CCP CO Shuhayda to testify about inmate requests to speak with a supervisor regarding sanitation of B Block on October 2, 2020. The Commonwealth objected on relevancy grounds, noting that a request to speak to a supervisor would only be relevant if made by Brolin, which it was not. It also argued that even if Brolin had made a request, it would still not justify a refusal to comply with the lock-in order. The court sustained the objection based on the lack of relevance of the requests made by other inmates. (*See id.* at 39-41).

**D.**

Brolin testified that he had been an inmate at the CCP since June 2020. He was aware of COVID-19 and its associated risks prior to his incarceration and continued reading about it in the *Prison Legal News* provided to inmates. He maintained he could not use a CCP tablet because his access code was not working. However, he also stated that he spoke with a white shirt approximately a week before the October 2, 2020 riot about the fact that using the tablet to talk to his father made communication difficult because his father is elderly and he complained that he could not do so by telephone because of Covid-19 restrictions. Although he alleged that as of the day of the riot, there had not been any white shirts or counselors on B Block for a week due to Covid-19, Brolin testified that in the days before the incident, Captain Sobecki was aware of the inmates' grievances. (*See id.* at 52-54).

On the day of the riot, Brolin did not request to speak to a white shirt because he knew several other people had already done so. He was concerned about moving to C Block because he believed that inmates who tested positive for Covid-19 were transferred there. He explained that the inmates were outside in the yard prior to the incident and:

> When we came in, people … started to ask about the white shirt again and [Officer] Shuhayda refused. So I don't even remember who the first one was that were like "I'm not locking in until we see a white shirt." And people started to sit down and agree with that saying we needed to see a white shirt before we locked in.
>
> I went up to my cube—well, some people said you want to play cards while you wait for the white shirt and I said sure. I

> went up to my cube and got a cup of coffee, came back down and I just joined them shortly whenever Lieutenant Sanford and the others came on to the block for the first time.

(*Id.* at 57).   Brolin testified that he never became aggressive with the COs and that he only wanted to talk to someone about his concerns.   He noted that the video did not show him behaving aggressively and showed he tried to stay out of the situation, although he acknowledged that refusing to comply with the lock-in order was a violation of CCP policy.   (*See id.* at 51-65).

The same day, the trial court convicted Brolin of disorderly conduct.   It sentenced Brolin to pay the costs of prosecution and a $100 fine and to 90 days of probation.   Brolin's post-sentence motions were denied after a hearing.   He timely appealed and filed a court-ordered statement of errors complained of on appeal.   *See* Pa.R.A.P. 1925(b).

On appeal, Brolin raises four issues for our review:  (1) whether the trial court erred in denying his motion for change of venue/to recuse; (2) the sufficiency of the evidence to support the conviction; (3) the weight of the evidence to support the verdict; and (4) whether the trial court erred in precluding him from calling witnesses.   (*See* Brolin's Brief, at 3).

## II.

## A.

Brolin argues that the trial court abused its discretion in denying his motion for change of venue/motion to recuse[3] all Cambria County judges from presiding over his non-jury trial because they could not be impartial due to their knowledge of the facts of the case, employment with Cambria County and their vested interests in protecting the CCP and its employees.

"In general, a motion to recuse is properly directed to and decided by the jurist whose participation the moving party is challenging." *Watson*, 228 A.3d at 939 (citation omitted). "It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness, which raises a substantial doubt as to the jurist's ability to preside impartially." *Id.* (citation omitted).

> The inquiry is not whether a judge was in fact biased against the party moving for recusal, but whether, even if actual bias or

---

[3] It is well settled that "Where a jurist rules that he ... can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion." *Commonwealth v. Watson*, 228 A.3d 928, 939 (Pa. Super. 2020) (citation omitted).

> In reviewing the denial of a recusal motion to determine whether the judge abused his discretion, we recognize that our judges are honorable, fair and competent. Based on this premise, where a judge has refused to recuse himself, on appeal, we place the burden on the party requesting recusal to establish that the judge abused his discretion.

*Id.* (citation omitted).

prejudice is lacking, **the conduct or statement of the court raises an appearance of impropriety**. The rule is simply that disqualification of a judge is mandated whenever a significant minority of the lay community could reasonably question the court's impartiality.

*Id.* (citation omitted).

Brolin maintains that the trial judge who presided over his case had "significant personal knowledge" about the incident since he had presided over the trial of 21 other inmates involved in the riot and that he was on the Cambria County Prison Board. (*See* Brolin's Brief, at 16). However, he fails to produce any evidence establishing that the judge's conduct has reflected "bias, prejudice or unfairness" or that he made any statement raising the appearance of impropriety. *Watson*, 228 A.3d at 939 (citation omitted). To accept Brolin's argument absent any actual evidence of the appearance of impropriety would mean that a trial court could not oversee **any** criminal trials in general because the prosecutor is a county employee and oversees specifically any trials that involve incidents in county prisons. The trial court denied Brolin's motion because after considering his argument, it determined that it could preside over the matter impartially, and that the relationship between CCP staff and the bench would not cause a significant minority of the community to question the court's impartiality. (*See* Trial Ct. Op., at 7). We discern no abuse of discretion and this issue lacks merit. *Watson*, 228 A.3d at 939.

**B.**

Brolin argues that the evidence was insufficient to support his conviction of disorderly conduct because, "although he did not initially comply with the lock-in order, [he] made no attempts to create a hazardous condition which created danger or risk."[4] (Brolin's Brief, at 20); (*see id.* at 18). He maintains that although his conduct might have violated policies at the prison, it did not rise to the level necessary to prove disorderly conduct. Moreover, his actions served the legitimate purpose of trying to address his concerns about Covid-

_____

[4] In reviewing the sufficiency of the evidence, our standard of review is as follows:

> The standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom is sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. The Commonwealth may sustain its burden of proving every element beyond a reasonable doubt by means of wholly circumstantial evidence.

> The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubt raised as to the accused's guilt is to be resolved by the fact-finder. As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record. Therefore, we will not disturb the verdict unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

*Commonwealth v. Vogelsong*, 90 A.3d 717, 719 (Pa. Super. 2014), *appeal denied*, 102 A.3d 985 (Pa. 2014) (citations and quotation marks omitted).

19 with supervisors since inmates were not receiving information and feared for their health.

Section 5503 of the Crimes Code provides, in pertinent part, that "[a] person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he … creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor."  18 Pa.C.S. § 5503(a)(4).  "Public" includes "prisons ... or any premises which are open to the public."  18 Pa. C.S. § 5503(c).  "The offense of disorderly conduct is not intended as a catchall for every act which annoys or disturbs people; it is not to be used as a dragnet for all the irritations which breed in the ferment of a community." **Commonwealth v. Mauz**, 122 A.3d 1039, 1041 (Pa. Super. 2015) (citation omitted).  "It has a specific purpose; it has a definite objective, it is intended to preserve the public peace." **Id.** (citation omitted).

We agree with the trial court that, "[b]y refusing to comply with the lock-in order and arguing with Sanford, Brolin's actions intentionally caused public inconvenience, annoyance, or alarm, and/or recklessly created a risk thereof by creating a hazardous or physically offensive condition."  (Trial Ct. Op., at 10).  It is undisputed that Brolin was an inmate at CCP on October 2, 2020, and refused to comply with the lock-in orders until chemical weapons were deployed.  (**See** Brolin's Brief, at 20).

According to Lieutenant Sanford's testimony, when he arrived at B Block, Brolin was seated at a nearby table playing cards. (*See* N.T., 8/18/22, at 8, 22). Brolin did not comply with either of Lieutenant Sanford's lock-in orders until chemicals were disbursed to obtain compliance and he argued with Lieutenant Sanford, other COs and fellow inmates. (*See id.* at 8, 13-14, 22). In his report, Lieutenant Sanford stated that Brolin was one of the "most vocal and loudest inmates" and was "instigating and encouraging other inmates not to comply." (Defendant's Exhibit 6, at 1). The prison inmates became increasingly aggressive ultimately resulting in a riot that required the response of multiple law enforcement agencies to resolve. Surveillance video corroborated Lieutenant Sanford's testimony. (*See* Joint Exhibit 2).

Captain Rozum testified consistently with his report about what the video surveillance showed. The video showed Brolin sitting at the round table with other inmates playing cards and staying at the table until after chemical munitions were deployed, at which point he rose from the table and appeared to speak to Lieutenant Sanford. (*See id.* at 42-45); (Defense Exhibit 5).

Based on the foregoing, the evidence establishes that by refusing to comply with the lock-in orders and instead loudly instigating others, ultimately requiring the COs to disburse tear gas to obtain compliance, Brolin intentionally created an inconvenience, annoyance or alarm, or recklessly created a risk thereof, resulting in the creation of a hazardous or physically offensive condition. *See* 18 Pa.C.S. § 5503(a)(4).

Moreover, Brolin's argument that his non-compliance served a legitimate purpose because he wanted to speak with a supervisor about his Covid-19 concerns is belied by his own trial testimony. At trial, Brolin testified that he knew other inmates already had requested to speak to a supervisor about the Covid-19 issue, so he did not attempt to speak with staff about his concerns. (*See* N.T. Trial, at 53-67). Further, the evidence at trial was that Warden Smith and his staff were available to speak with and counsel inmates on Covid-19 issues on a daily basis, had posted information in the cell blocks and issued informative memos on what mitigation steps the prison was taking. (*See id.* at 33-38); (Defense Exhibit 2, Posted Covid-19 Information); (Defense Exhibit 3, Covid-19 Mitigation Procedures Memo, 9/25/20). Brolin testified that he had spoken with a white shirt approximately one week prior to the riot and elected not to speak to him about his alleged Covid-19 concerns, instead complaining about having to use a CCP tablet to contact his father. (*See id.* at 53-54). Thus, his refusal to comply with the lock-in order did not serve a legitimate purpose, and the trial court properly found that the evidence was sufficient to establish the offense of disorderly conduct. *See Vogelsong*, 90 A.3d at 718.

## C.

Brolin claims that the verdict is against the weight of the evidence because it is based on the prejudice created by the Commonwealth's trial

witness, Lieutenant Sanford.[5]  He maintains that this testimony was "somewhat inconsistent" with the soundless video and that his actions did not rise to the level of that of the other inmates.  (Brolin's Brief, at 22).  Moreover, he notes that Captain Rozum's report, which was based on his review of the surveillance video, did not state that Brolin created a disturbance.

> For an appellant to prevail on a challenge to the weight of evidence, he must establish that the evidence was so tenuous, vague, and uncertain that the verdict shocks the conscience of the court.  One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence.  Moreover, the weight of the evidence is exclusively for the finder of fact, who is free to believe all, none, or some of the evidence and to determine the credibility of the witnesses.

*Commonwealth v. Gilliam*, 249 A.3d 257, 269-70 (Pa. Super. 2021), *appeal denied*, 267 A.3d 1213 (Pa. 2021) (citations, quotations marks and brackets omitted); *see also Commonwealth v. Charlton*, 902 A.2d 554, 562 (Pa. Super. 2006), *appeal denied*, 911 A.2d 933 (Pa. 2006) ("It [is] within the

_____

[5] It is well-settled that:

> [O]ur standard of review for a weight of the evidence claim is an abuse of discretion.  As we have often reminded appellants, [a]n appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court*.*  Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence*.*

*Commonwealth v. Rogers*, 259 A.3d 539, 541 (Pa. Super. 2021) (citation, quotation marks and emphases omitted).

province of the … fact-finder to resolve all issues of credibility, resolve conflicts in evidence, make reasonable inferences from the evidence, believe all, none, or some of the evidence, and ultimately adjudge appellant guilty.") (citation omitted).

Instantly, the trial court found the testimony of Lieutenant Sanford and Captain Rozum, which was corroborated by the surveillance video, to be credible. (*See* Trial Court Op., at 14). The court was free to believe all, some or none of the evidence, and to the extent there were any inconsistencies, it was within its province to resolve them. *See Charlton*, 902 A.2d at 562. As previously stated, the evidence was sufficient to support the conviction and we will not re-weigh the evidence or override the trial court's credibility decision. *See Gilliam*, 249 A.3d at 269-70. Because we discern no abuse of discretion, this issue lacks merit. *See Rogers*, 259 A.3d at 541.

**D.**

In his final issue, Brolin argues that the trial court abused its discretion in sustaining the Commonwealth's relevance objections to his proposed witnesses because all of them were relevant to show that his actions served a legitimate purpose because the inmates were concerned about Covid-19. Specifically, he maintains that the trial court abused its discretion when it limited the testimony of Warden Smith and Captain Rozum, although Warden Smith had the most knowledge about how the CCP was addressing the Covid-19 pandemic. (*See id.* at 25-26, 37, 41). He complains that the trial court

precluded Detective Hines from testifying, although he would have testified about his report that contained information about why the inmates were upset about the Covid-19 situation at the CCP. (*See id.* at 26-30). Finally, he maintains that CCP CO Shuhayda's proposed testimony about inmate requests to speak with supervisors regarding sanitation efforts in response to Covid-19 was relevant to his defense that he had a legitimate reason not to comply with the lock-in orders.[6] (*See id.* at 39-41). The Commonwealth responds that the trial court deferred a decision on the relevance of Detective Hines's testimony and never ruled on it and, even if it had, Brolin's complaints about Covid-19 did not justify his refusal of the COs' lock-in orders. Similarly, the Commonwealth maintains that other inmates' requests to speak with CCP CO Shuhayda was irrelevant to Brolin's refusal to lock-in, thereby committing disorderly conduct.

_____

[6] We observe that:

> In reviewing a trial court's ruling on the admissibility of evidence, our standard of review is one of deference. Questions concerning the admissibility of evidence are within the sound discretion of the trial court, and its discretion will not be reversed absent a clear abuse of discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Thompson*, 106 A.3d 742, 754 (Pa. Super. 2014), *appeal denied*, 134 A.3d 56 (Pa. 2016), *cert. denied*, 137 S. Ct. 106 (2016) (citations and quotation marks omitted).

"All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa. R.E. 402. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." ***Commonwealth v. Stallworth***, 781 A.2d 110, 117-118 (Pa. 2001) (internal citations omitted); ***see also*** Pa. R.E. 401. "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Brolin admits that he did not follow the COs' lock-in orders, but argued that this did not create a hazardous or physically offensive condition and was justified[7] because of his and other inmates' concerns about Covid-19 procedures in the prison.

First, CCP CO Shuhayda's proposed testimony about **other** inmates' requests to speak to a supervisor about the sanitation methods being utilized for COVID-19 was irrelevant to whether a legitimate purpose was served by **Brolin** creating a hazardous or physically offensive condition by failing to

---

[7] The Crimes Code provides that "Conduct which the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable if … the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged[.]" 18 Pa.C.S. § 503(a)(1).

comply with the lock-in orders and instigating fellow inmates. Brolin and Warden Smith testified that there were procedures in place to bring such concerns to the attention of supervisors. (**See** N.T. Trial, at 33, 51). While Brolin maintained that the procedures were inadequate for him, he provided no evidence of this other than his own opinion testimony. Moreover, even if CCP CO Shuhayda's testimony was relevant, it was cumulative where Brolin testified that other inmates had requested information from supervisors about Covid-19 sanitation methods at the CCP.

As to Detective Hines, the record reveals that the trial court did not rule on the Commonwealth's relevancy objection to Detective Hines's testimony. Instead, it deferred deciding the objection until such time as Brolin called Detective Hines, but he never did so; nor did he seek to introduce Detective Hines's report through Warden Smith as suggested by the court. Therefore, this issue has no merit because the court did not grant the Commonwealth's objection in the first place. Even if Brolin construed the court's discussion of the issue as precluding Detective Hines's testimony, Detective Hines was not present for the riot and his proposed testimony was not based on his observations of the surveillance video, so any testimony about underlying Covid-19 concerns of the inmates would be hearsay and cumulative.

Finally, Brolin complains that the trial court limited the testimony of Warden Smith and Captain Rozum, despite Warden Smith having the most knowledge about how the CCP was addressing the Covid-19 pandemic and

Captain Rozum being present at the ensuing disciplinary proceedings. We discern no abuse of discretion.

The record reflects that Warden Smith testified about the CCP's Covid-19 sanitation and mitigation procedures up to the date of the riot, and that personnel were available to answer inmate questions about COVID-19. (*See* N.T. Trial, at 33-38). Evidence of the unit postings and the mitigation memo were entered into evidence. (Defense Exhibits 2 and 3). After the court granted the Commonwealth's objection to the relevance of the mitigation memo distributed after the riot, Warden Smith stated it was the same as the previous memos anyway. (*See* N.T. Trial, at 36-37). Captain Rozum was precluded from testifying about the CCP's internal disciplinary process that occurred after the riot, but was permitted to testify about the report that he authored based on his review of the surveillance video and the report was admitted into evidence. (*See id.* at 42-45).

We discern no abuse of discretion. Brolin has failed to demonstrate that the trial court overrode or misapplied the law or exercised manifestly unreasonable judgment as a result of bias, prejudice, ill-will or partiality. *See Thompson*, 106 A.3d at 754. Accordingly, we conclude that the trial court properly exercised its discretion in precluding the testimony of CCP CO Shuhayda and limiting the testimony of Warden Smith and Captain Rozum. *See id.*

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/26/2023